## GIDNEY v. CHAPPELL *et al.*

No. 569.   Opinion Filed July 12, 1910.

Rehearing Denied Sept. 27, 1910.

(110 Pac. 1100.)

1.   **DEEDS—Validity—Admissibility of Evidence.** In a suit in equity by the sole heir of a deceased person to set aside a conveyance, acquittance, and receipt preliminary to the contest of a will bequeathing the property conveyed to a stranger upon the grounds of want of testamentary capacity on the part of the testatrix and that said will was procured by fraud and undue influence, when it is alleged in the bill that the fraud and undue influence practiced in procuring the will is a link in the chain of fraud whereby the defendant obtained the conveyance, etc.; the facts in relation to the execution of the will are material as a matter of evidence.

2.   **CONTRACTS—Confirmation of Voidable Transaction—Estoppel.** If a party originally possessing a remedial right has obtained full knowledge of all the material facts involved in the transaction, and has become fully aware of its imperfections and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive, or affirmative, is destroyed. If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation, however formal, is effectual. The voidable nature of the transaction is unaltered.

3.   **FRAUD—Misrepresentation—Disclosure of Part of Truth.** Although a party may keep absolute silence and violate no rule of law or equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth. A partial statement, then, becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation.

4.   **REFERENCE—Findings—Setting Aside.** In a suit in equity, commenced in the courts of the Indian Territory prior to statehood, and by consent referred to a master in chancery to take

Vol. 26—47

the evidence and make findings of fact and conclusions of law, it was not error for the district court, as successor of the court wherein said suit was commenced, to set aside the findings and conclusions of the master and make findings of fact and conclusions of law of its own, when the findings of the master are clearly in conflict with the weight of evidence upon which they were made.

5.	EQUITY—Pleading—Offer to Do Equity. An allegation in a bill in equity to set aside a conveyance for fraud preliminary to the contest of a will that states, in substance, that if it should be found upon the hearing that the consideration received by said plaintiff for the execution of said conveyance was not money of the testatrix of the will, whose sole heir at law said plaintiff is, but was money of said defendant, said plaintiffs are willing to do equity and will upon the establishment of said fact repay such money with interest to said defendant, and are willing to have the relief awarded made subject to such repayment within a time to be fixed by the court, constitutes a sufficient offer to do equity.

(Syllabus by the Court.)

*Error from District Court, Muskogee County; R. McMillan, Special Judge.*

Action by Sidney C. Chapple and another against Samuel E. Gidney. Judgment for plaintiffs, and defendant brings error. Modified and affirmed.

*Wm. T. Hutchings, Geo. A. Murphy* and *Wm. P. Z. German,* for plaintiff in error.

*Lewis & Phillips, N. B. Maxey, W. F. Schurmeyer* and *Chas. F. Runyan,* for defendants in error.

Briefs did not reach the reporter.

KANE, J. This was a suit in equity, commenced by the defendants in error, plaintiffs below, against the plaintiff in error, defendant below, to cancel a conveyance by the plaintiff Sidney C. Chapple of all his right, title, and interest in and to his mother's estate to Samuel E. Gidney, the defendant, and a certain release and receipt executed in connection therewith; said suit being preliminary to a contest to set aside the will of Mrs. Sarah C. Rawlings, Chapple's mother, whereby she willed practically all her property to the defendant. After issue joined, it was stipulated by and between the parties that the cause should be referred to

the master in chancery of the court wherein the cause was pending, to take testimony and report his findings of fact and conclusions of law, together with the testimony taken. The master made findings of fact favorable to the defendant and conclusions of law, as follows:

"I am therefore of the opinion and conclude that at the time of the execution of the will in question, to-wit, October 23, 1905, and at the time of the execution of the codicil thereto, to-wit, April 13, 1906, the said Sarah Rawlings had sufficient understanding to comprehend the nature of her acts and the nature and extent of her property, the natural objects of her bounty and the persons to whom she desired to give it, without the aid of other persons. I am further of the opinion, and conclude, that the legal presumption of undue influence and fraud which attached to the acts of an attorney who is the principal beneficiary in a will drawn by him for his client is rebutted in this case by the fact that the will as finally executed, together with its codicil, are so far as her son, Sidney C. Chapple, is concerned, substantially in accordance with a determination as to the disposition of her property, reached by the testatrix long before she met the defendant, Gidney, and that the plaintiff Chapple lost nothing by reason of the said defendant becoming the beneficiary in said will, as his practical disinheritance was determined upon by the testatrix long before she met Gidney, and the only conclusion at which I can arrive is that, if Gidney had not been the principal beneficiary under the will, some person other than the plaintiff, son of the testatrix, would have been such principal beneficiary. I am further of the opinion and conclude that the defendant, Gidney, was not guilty of fraud toward, and did not exercise undue influence over, the testatrix in the matter of the making of said will of October 23, 1905, or the codicil thereto dated April 13, 1906. I am further of the opinion and conclude that the defendant, Gidney, did not exercise fraud toward nor undue influence over the plaintiff Sidney C. Chapple in the matter of the execution of the assignment and receipt and acquittance in question in this cause. I am further of the opinion, and conclude, that the execution of said will and the dealings between the defendant and the plaintiff Chapple at the time of the execution of the assignment and acquittance in question in this suit were not a part of any general fraudulent scheme on the part of the defendant, Gidney, to secure for himself the property of said testatrix. I therefore

recommend that this cause be dismissed for want of equity, and that the costs thereof be taxed against the plaintiffs."

Numerous exceptions were filed to this report, all of which were sustained, whereupon the court made findings of fact favorable to the plaintiffs, as follows:

"The court finds that the conveyance and the release executed by the plaintiff Sidney C. Chapple to the defendant, Samuel E. Gidney, on the 22d day of June, 1906, were obtained by the said Gidney by fraudulent representation, and by a failure to disclose knowledge in his possession in relation to the estate of Sarah Rawlings, which was his duty to disclose. The court further finds that the defendant Samuel E. Gidney had at the time of the execution of said instruments been the attorney for Sarah Rawlings, the mother of the plaintiff Sidney C. Chapple, for something like one year; that he had been her attorney and confidential adviser, and has been paid to look after her estate, and had taken trips to Texas for the purpose of ascertaining the status of her estate, and that he had thus obtained knowledge of her said estate and affairs, which was unknown to Sidney C. Chapple at the time of the execution of said instruments, and that the defendant, Samuel E. Gidney, failed to disclose what he knew in relation to said estate to the said Sidney C. Chapple, but withheld information which it was his duty to disclose. The court further finds that the plaintiff Sidney C. Chapple had spent but little time at the home of his mother for the last years of her life, and knew but little of the estate, and that he relied upon Gidney, who had been the attorney for his mother, and was the executor of what purported to be her will, and that he believed what Gidney told him, and acted upon Gidney's representations. The court further finds that taking into consideration the value of said estate, which is worth from $10,000 to $15,000; that the consideration of $510 was totally inadequate when considered in connection with the facts and circumstances under which said instruments were procured. The court further finds that the will executed by Sarah Rawlings on the 23d day of October, 1905, in which she virtually disinherited her son, Sidney Chapple, is void for the reason that the said Sarah Rawlings did not have sufficient testamentary capacity at the time of executing the same to make a fair and intelligent disposition of her estate. The court further finds that the defendant, Gidney, is entitled to a return of the consideration paid by him to the said Sidney C. Chapple for the execution of said

instruments, and that the said Sidney C. Chapple shall return the same to him upon the execution by the said Gidney of a good and sufficient conveyance reconveying to him all of the property included in said instrument. The court further finds that the plaintiff J. C. Scully is the owner of an undivided one-half interest in the estate of the said Sarah Rawlings, deceased, by virtue of a conveyance executed to him by his coplaintiff Sidney C. Chapple on the 3d day of August, 1906."

Upon these findings the court entered a decree as follows:

: "It is therefore considered ordered, adjudged, and decreed by the court that the conveyance and release from Sidney C. Chapple to the defendant, Samuel E. Gidney, made on the 22d day of June, 1906, be and the same are hereby canceled and set aside, and held for naught. It is further considered, ordered, adjudged, and decreed by the court that the plaintiffs Sidney C. Chapple and J. C. Scully return to the defendant, Samuel E. Gidney, the sum of $510, together with interest thereon from the 22d day of June, 1906, at the rate of 6 per cent. per annum, being·the consideration paid by the said Gidney for the conveyance and release herein canceled and set aside, and that the said Samuel E. Gidney surrender up the said conveyance and release, and that he execute to the plaintiffs Sidney C. Chapple and J. C. Scully a reconveyance of all the property so conveyed to him. It is further ordered, considered, adjudged, and decreed by the court that the plaintiffs Sidney C. Chapple and J. C. Scully deposit the diamond ring and ear bobs belonging to the estate of Sarah Rawlings with the clerk of this court to be held by him subject to the future order of this court. It is further considered, ordered, adjudged, and decreed by this court that the defendant, Samuel E. Gidney, pay all the costs of this proceeding, and that any part of the costs that have been heretofore been paid by plaintiffs shall be deducted out· of the said $510 which they are herein required to return to the said Samuel E. Gidney."

To reverse this decree this proceeding in error was commenced.

The grounds upon which the instruments executed by Chapple are assailed are (1) that the defendant, Gidney, while employed as an attorney and counselor at law by Mrs. Rawlings,· a woman lacking testamentary capacity because of her impaired mental and physical condition and loss of will power, conceived the idea of

obtaining her estate as against her lawful heirs; that in pursuance of this purpose, by undue influence and fraudulent practices and devices, he induced the said Sarah C. Rawlings to execute a will practically disinheriting her son and kindred, and giving all her property to himself; that knowing this will was a nullity under the facts, and to cure the defects. therein, in pursuance of his original design and purpose to defraud plaintiff of his estate and in continuation of the same, he obtained from Chapple the deed and other instruments set out; that the same because so procured were tainted with whatever acts of fraud or unlawful device that had induced the making of the will and were for this reason null and void; (2) that the means whereby he procured the conveyance, acquittance, and receipt from Sidney Chapple were in pursuance of a continuing scheme and design to defraud him by obtaining Mrs. Rawlings' property by means of an invalid will and confirming the same by acts that could be set up as acts of confirmation or estoppel on the part of the son, which acts are ineffectual because, taken with the original fraudulent purpose and design, the defendant Gidney was guilty of such acts of fraud by false statement and concealment of knowledge which it was his duty to disclose to Chapple that said conveyance, acquittance, and receipt ought to be canceled.

The cause was well tried below, and ably and exhaustively briefed in this court. The main grounds upon which counsel for plaintiff in error contend the judgment of the court below ought to be reversed, as we gather them from their brief, are as follows: (1) The action of the trial court in setting aside the findings of fact and conclusions of law of the master, to whom was referred by written stipulations of the parties the power to take the testimony and report his findings of fact and conclusions of law to the court, together with the testimony taken before him, is in direct conflict with former decisions of this court, wherein it is held that, "when the parties to a suit in equity consent to a reference thereof to a master to hear and decide all the issues therein and report his findings both of fact and of law, such findings of

fact should have been treated as so far correct and binding as not to be disturbed, unless clearly in conflict with the weight of the evidence upon which they were made." *Hope v. Bourland,* 21 Okla. 864, 98 Pac. 580; *Richardson v. Harsha,* 22 Okla. 405, 98 Pac. 897; *Locust v. Caruthers,* 23 Okla. 373, 100 Pac. 520; *Mellon v. Fulton,* 22 Okla. 636, 98 Pac. 911, 19 L. R. A. (N. S.) 960; *Turner v. Mills,* 22 Okla. 1, 97 Pac. 558. (2) As this suit does not attempt to set aside the will, but simply endeavors to restore Chapple where he was before the execution of the release and acquittance and to place matters in *statu quo* in order to enable Chapple to attack the will, it was therefore necessary for him to bring the consideration he had received into court as a condition precedent to the maintenance of his suit to set aside this release and acquittance. (3) That Chapple having come to the defendant in the role of antagonist, seeking to defeat the will, the defendant met him as he ought to have met him, as one dealing at arm's length, and not bound to reveal to him all that he knew or to take him into his confidence as one bearing a fiduciary relation to a beneficiary should do. That under such circumstances it was the duty of Chapple to have made full inquiry and obtained full knowledge of every fact essential to protect him in making this settlement. That all statements of Mr. Gidney as to the value of the estate were mere opinions, rather than facts upon which misrepresentation and fraud could not be predicated. That Chapple dealt with Gidney at his peril, and, if he did not know the facts, it was his, and not Gidney's, fault. (4) That the court erroneously decreed, not only that the release and conveyance should be set aside and canceled, but that Gidney should execute to Chapple and Scully a reconveyance of all the property conveyed to him, and this in the face of the admitted fact that the suit to set aside the will was still pending, that the will could not be set aside in this action, and that the will was a valid instrument, and that Gidney took and owned this property under it until it was properly set aside by a court having jurisdiction to do so and in a trial for that purpose. (5) That inadequacy of consideration will not avail to set aside a deed unless accompanied by fraud or unless it

is so gross as to imply fraud. This is especially true where one is buying or selling property to which the title is in dispute.

Before taking up the foregoing specifications of error in their order, we will notice a statement by counsel for plaintiff in error in their brief, to the effect that the question of the will has little, or nothing, to do with this case. We think the facts relating to the execution of the will are material here as a matter of evidence. The theory of plaintiff is that the obtaining of the release was only a link in the chain of fraud and deception which Gidney used, first, to obtain the will from the plaintiff's mother; and, second, to prevent a contest of that will by the son. It seems quite clear that, if it is found that Gidney procured the will by fraud and undue influence, the motive is established for practicing fraud upon the son in furtherance of his first wrongful act. To this extent the finding of the court on that question is pertinent, and should not be disturbed unless found erroneous on some other ground.

A careful review of the evidence shows the following facts to be established beyond controversy: The testatrix, who died in middle life, had been four times married. From two of her husbands, Bidd, the father of Sidney, and Craig, she had been divorced. With reference to the death of two of them, Chapple and Rawlings, suggestions of her having murdered them arose and were considered. The only child born to her was Sidney, who bore the name of the second husband. From the time he was 12 years of age he was away from home caring for himself. His mother at times blamed herself for his lack of rearing and education and the circumstances of his life. A few years before her death she married H. H. Rawlings, somewhat advanced in years, and wealthy. He died under circumstances that seemed to have aroused some suspicion in the minds of the heirs of his estate, and a question was raised whether he had left a will which had been secreted or destroyed. Mrs. Rawlings at this time was in impaired health, and was greatly harassed and disturbed by a grand jury investigation into the death of Rawlings, and by controversies with his kindred over his estate. From the death of Mr. Rawlings

she appears to have executed and offered to execute various wills, powers of attorney, etc., relating to her property. She gave a power of attorney to one Cassells to wind up her estate and employed W. P. Finley, a lawyer of Dallas, to represent her interest, and Finley, being sick and compelled to leave the city, associated with him Judge Smith, who acted as her legal adviser and counselor. Smith is shown by the testimony to have been a lawyer of the highest character for integrity and ability. As the result of his services, no indictment was returned against Mrs. Rawlings, and an agreement was reached with the other claimants of her husband's estate, which was fully explained to her and with which she expressed herself as entirely satisfied, so much so that she proposed to double the amount of the fee Smith had contracted for. which was refused. During this time she proposed to Smith that if he would accept an appointment as trustee in a deed of trust, to control the general management of all her estate, real and personal, he should have exclusive management of it during her lifetime at a fair compensation, and that at her death she would will all of her property to him, all of which he refused. In the meantime she became acquainted with one Meyers, a country constable having no experience in affairs, to whom she gave a power of attorney to receive all her papers and to manage her estate. This power was presented to Judge Smith and he refused to act upon the same, because of its insulting charges, and another was drawn omitting these charges and Smith's relation as attorney for Mrs. Rawlings ceased, although he continued to represent Lee Hughes, who had been appointed administrator on his suggestion. Judge Smith testified that she (Mrs. Rawlings) was very notionate and changeable, and nearly worried him to death, calling him up at times to say that the neighbor's chickens had gotten into her yard and asking his advice; that these characteristics were so marked that, when he desired to collect his fee, he called in some gentlemen of his selection, men of the highest character and responsibility, and told Mrs. Rawlings to bring some of her friends, which was done, and the fee was discussed, the services and the condition of the estate explained, and Mrs. Rawlings expressed herself as

satisfied and wanted to double his fee, which he refused. In the meantime Meyers had taken Mrs. Rawlings to Judge Chas. F. Clint, long a district judge in Dallas county, and a lawyer of high integrity and correct ideas of professional duty. She agreed to pay him $50 for drafting her will, in which she proposed to leave her property to Meyers, remarking that she had a son who was a weak boy and was intemperate and licentious, and that she did not propose to leave him anything. Judge Clint suggested that, though the child might be weak and vicious, he did not think that was a sufficient reason for disinheriting him, and leaving the property to a stranger, and that she could leave the property in trust for his benefit. In the course of the conversation, she indicated that her property should be left to Sidney in trust, and, in the event of his death, to Meyers. To Clint's suggestion that it would be unjust and unnatural to leave out her relatives she assented, and the will was to be drawn including them, while the trustee was to be well paid for his services. This will was drawn and delivered to her. She then desired to know what Clint would charge to recover for her what she was entitled to of her husband's estate. The evidence of Judge Smith and Hughes, the administrator, shows that the estate was being duly administered, and that, as funds accumulated, all she had to do was to receive from the administrator a dividend check. Clint agreed to investigate the estate for $100 and give her an opinion, and, while doing this, concluded that the will he had drafted was prematurely drawn in respect to the way she had left it in the hands of the trustee, and also as to who the trustee should be, and he advised her to destroy the will and wait until she knew exactly what the condition of her estate was before making a will. About this time, her health continued to be poor and she left for San Antonio, and Clint advised Meyers what to do and went to work himself, but, as he testified, "I found out that Meyers did not want to go to work." Clint testified, in substance, as follows:

"I told Meyers that I would be simply misrepresenting the widow, and so would he as agent, if he and I simply sat down and took what she could get without our aid, and that for me to take

a per cent. out of it and for him to take a still larger per cent. out of it would be nothing but graft, and that should not be done, and I had him send her a telegram to come back to Dallas. When she came back here, I in her presence took my authority that she had signed and tore it up, giving as a reason therefor that I could not do her one particle of good, as there was nothing for me to do but help her do something that she could do herself, and I thereupon withdrew from her service, charging her nothing for writing the will or for the opinion I had given her.

After the retirement of Judge Clint, Meyers retained an attorney by the name of Spellman. A controversy arose with the administrator over the payment to Meyers and Spellman of some $34,900 accruing from the estate. It was clear that all Mrs. Rawlings had to do was to receive this check herself from the administrator, but Meyers and Spellman insisted that it be paid to them. The matter was finally settled by the administrator issuing a check payable to both Mrs. Craig and Meyers. Meyers and Spellman charged $1,900 for this service. While in San Antonio Mrs. Rawlings employed a San Antonio lawyer to look after her interests, and he came to Dallas and interviewed Judge Smith.

About the time of this Meyers-Spellman transaction she moved to Haskell, in the Indian Territory, and had a lawyer from Tulsa to write a revocation of the Meyers power of attorney. Shortly thereafter she became acquainted with Mr. Martin, then associated with Gidney in the law practice, and he transacted some legal business for her. Thereafter, endeavoring to get Martin, Gidney answered the telephone, and was requested to come to Haskell to see her, which he did on the 1st day of July, 1905. After the second interview with Gidney, she gave him a power of attorney, providing that he should have power to examine into all matters pertaining to her interest, etc., to sue for and collect her insurance policies, debts, and demands, etc., from Hughes, Meyers, or other persons. Thereafter Gidney went to Texas and investigated her affairs, which the evidence shows were in good condition, as fully explained to the testatrix by Judge Smith and Judge Clint. While in Dallas, Gidney interviewed Judge Smith and the administrator, and saw the Meyers power of attorney. In rela-

tion to the information gained by Gidney on this visit, Judge Smith testified:

"I told Mr. Gidney the history of the whole case from start to finish, including Meyers' connection with it, and what I regarded as a useless employment that she had engaged Meyers in, and that in my judgment Meyers should be sued for what he got from her, provided he was solvent."

After his return Mrs. Rawlings executed a second power of attorney to him, providing a compensation of 15 per cent. commission on what he could collect of the estate. At or about the time Gidney was in Dallas Mrs. Rawlings was there, accompanied by a traveling doctor that she had brought with her, at which time she solicited Judge Smith to take charge of her affairs again, which he refused to do. During the months she had resided in the Indian Territory, she had promised a number of people to provide for them in her will. On some of them suggesting that she remember her son, she broke down, shed tears, and thanked them. In the meantime she had two wills drawn, one dated the 12th day of July, 1905, and the other the 13th of September, 1905. In the first of these she named Mrs. Manning, a nurse, and her brother, as principal legatees, and Gidney executor with broad discretionary powers and large compensation. In this last will the provision in regard to her son Sidney was the same as in the will of July 12th. Gidney was made executor with the same compensation. The lots given in the first will to Mrs. Manning and seventeen shares of bank stock were left to Gidney, the bequest being inserted in the will by interlineation by Gidney. This will was made at about the seventh or eighth interview with Gidney. Among the legal services performed by Gidney was the procurement of a divorce for Mrs. Rawlings from one Craig, to whom she had been married but a few months. She seems to have been afraid that he (Craig) was likely to poison her. In the meantime the friendship between herself and Gidney continued to increase. She tells him of her unhappy experiences in life, and he sympathizes with her. He has become her architect in the construction of a residence, her money lender, purchasing agent, confidant, and

adviser. Without going further into detail, there was evidence tending to show generally that during her acquaintance with Gidney she would frequently discuss her family troubles with him or any chance acquaintance; that she did this with the vegetable man at Haskell, a domestic at a hotel at Muskogee, her physicians, and others; that she told Dr. Randall that it was hard to cut out her own flesh and blood, but that the Rawlings heirs would get her property, if she changed the papers. She also told Mrs. Smith, the domestic, that the Rawlings heirs would get her property, but that Gidney was protecting her; that this matter weighed so on her mind that near her death Dr. Mitchell, one of her physicians, requested Gidney to tell her that the estate was all right, and to reassure her on the subject; that within the period following the death of Rawlings she gave four powers of attorney, made four wills, had nine attorneys, proposed to make wills in favor of four individuals, who refused, had about a dozen doctors, spent $14,000 of the estate, let Meyers have over $1,900 for collecting money which she had only to ask for, of which she was advised by Judge Smith and Judge Clint; that she left Gidney her bank stock on the seventh or eighth interview, gave him the house that was on the lot where the brick residence was built in the sixth or seventh month of their acquaintance, made the will disinheriting her son, her brother, and her nieces in the third month of their acquaintance; that she communicated with spirits and believed that she was guided and controlled by them; that she proposed to sit in the snow as a mode of taking the cold air cure; that she was the victim of a progressive malady, whose inevitable end was death.

In the latter part of October, 1905, she executed the will now under consideration, making Gidney the principal beneficiary and bequeathing the sum of $500 to her son. Concerning this transaction, Gidney testified in substance:

"She stated that I had befriended her in many ways and had been careful in looking after her matters, and that she believed I would continue to do so, and she desired to make her will in my favor; that she had no relatives who had cared for her or had taken any interest in her, nor was there any one who had any

claims upon her. She stated that she had a brother, Sullivan Thorn, but had not heard from him in eight or nine years, or more perhaps, I know quite a length of time. She did not know whether he was living or dead; that he had not treated her right with reference to some matters of an estate in which she was interested, as I remember, either that of her father or mother, and there were not kindly feelings existing between them, and that he had taken no interest in her; that her son was not entitled to her property; that he had never taken the interest that a son should in her; that he had not cared for her; that he was wayward, reckless, a gambler, and a rake, and spendthrift, and a drunkard; that he had cost her already a great deal of money, as well as worry and heartache; that she had tried to make something out of him; that she had spent large amounts of money in trying to get him to go into business; that she had spent something in the neighborhood of $1,000 in trying to establish him in business in Haskell so that he might make something of himself, and be there to care for her, but that he neglected and abandoned his business; that he had deserted his wife of two weeks; that he had been cruel and abusive toward her, did nothing for her, and never had. When she first expressed the desire to make me the beneficiary of the will, I said nothing further with reference to it at the time, I believe. That it was very kind I think was about the remark I made. She mentioned it as often as I went there. She says: 'I don't know when I might drop off, Mr. Gidney, in my state of health,' and says, 'I wish you would make the will.' I was over there about the 19th of October, I think it was, 1905, and she insisted that I make the will, and told me that she desired to dispose of her property, naming me as the principal beneficiary, and I says, 'Well, I will fix it up for you and you can execute it in your new name,' she having theretofore made application for divorce from her former husband, Stephen E. Craig, and asked that her name be returned to Sarah Rawlings, which she had previously borne. After the execution of the will, and she and I were on the way to the station, she stated that she felt better, as she had wanted the will drawn for some time, and now that disposition of her property had been made just as she desired, and she says: 'Had I known you before as well as I do now, I would have made it that way at first, for you feel nearer to me than any of my kindred.' "

In April, 1906, a codicil, making some small additional bequests, was made to the will, and on the 17th of June, 1906, Mrs.

Rawlings died of consumption, after a lingering illness, which continued through all her acquaintance with Gidney.

Treating the admitted part of the foregoing statement as evidential facts pertinent to the transaction between Gidney and Chapple, we find them dealing with each other at the time the instruments herein involved were executed with the burden upon Gidney to show the mental capacity of the testatrix and the legal execution of the will (*Mowry et al. v. Norman,* 204 Mo. 173, 103 S. W. 15; *Goodfellow et al. v. Shannon et al.,* 197 Mo. 271, 94 S. W. 979; Gardner on Wills, art. 321; Schouler on Wills, art. 170) for the following reasons: (1) Because Gidney stood in the relation of attorney to Mrs. Rawlings at the time of the execution of the will, a fiduciary relation of the highest trust, and is the principal beneficiary in the will, the law indulges the presumption that undue influence was used in its procurement, and the burden is upon him to show the contrary. *Mowry v. Norman, supra; Campbell v. Carlisle et al.,* 162 Mo. 634, 63 S. W. 701; *Hegney v. Head et al.,* 126 Mo. 619, 29 S. W. 587; *Marx v. McGlynn,* 88 N. Y. 357; *Gay et al. v. Gillilan et al.,* 92 Mo. 250, 5 S. W. 7, 1 Am. St. Rep. 712; 2 Pom. Eq. Jur. art. 951. (2) Because the will is unnatural in that it disinherits an only child, and the brother and the nieces by blood of the testatrix, and confers her estate upon one in no wise related to her. *Walls et al. v. Walls et al.,* 30 Ky. Law Rep. 948, 99 S. W. 969. (3) Because "the universal maxim of law treats one who writes himself the heir as lending suspicion to the writing." Schouler on Wills, art. 245; *Goodloe v. Goodloe et al.,* 47 Tex. Civ. App. 493, 105 S. W. 533. It follows that, when Chapple and Gidney met for the purpose of talking over the estate of the testatrix, Chapple on the face of the will was a nominal beneficiary, but upon information within the knowledge of Gidney, who was executor and principal beneficiary, he was *prima facie* entitled to the whole estate. Under such circumstances, the following rule is applicable: If a party originally possessing a remedial right has obtained full knowledge of all the material facts involved in the transaction, and has become fully aware of its imperfections, and of his own rights to

impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative, is destroyed. If, on the other hand, the original undue influence still remains, or if the act is simply a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation, however formal, is effectual. The voidable nature of the transaction is unaltered. 2 Pom. Eq. Jur. art. 964; *City of Laredo* v. *Macdonnell*, 52 Tex. 511; *Ellis v. Ellis* (Tex. Civ. App.) 23 S. W. 996; *Byers v. Railway Co.*, 94 Tenn. 345, 29 S. W. 128; Bigelow on Fraud, 184; Kerr on Fraud and Mistake, 297; *Holt v. Holt*, 23 Okla. 639, 102 Pac. 187.

The facts and circumstances surrounding the execution of the conveyance and acquittance may be stated as follows: The defendant, Gidney, telegraphed Chapple that his mother was dead; whereupon he came to the defendant's office, in the city of Muskogee, after his mother was buried, and conferred with Gidney about his mother's estate; that Gidney, instead of stating to him the full and true situation, concealed material facts of which the defendant Gidney had full knowledge, and of which he knew that Chapple was ignorant; that Gidney told Chapple that his mother's estate was left in a bad condition; that the estate amounted to between $5,000 and $7,000; that she left a will willing Chapple $500; that he asked Chapple if he wanted to settle with him; that there would be practically nothing left of the estate after the debts were paid, and that he did not believe that there would even be enough to pay his fee as attorney; that, if Chapple fought, he could not win, and, if he won, he would have to pay a lawyer, and not have anything left, and that he, Gidney, would not have to pay a lawyer, as he was a lawyer himself; that the will of Sarah Rawlings was a valid one, and that if he (Chapple) contested it, he would not get as much as $500. Chapple in his testimony said

he believed Gidney's statements, and in reliance upon them executed the instruments. There is no serious contention on the part of the plaintiff in error that these, or statements of like import, were not made by Gidney. The master found the estate to be of about the value of $10,000, and the court finds it "is worth from $10,000 to $15,000." All of these figures to our mind are very conservative, and we are satisfied the last estimate is amply supported by the evidence. The evidence shows that Gidney first raised the question of settlement. He was named as executor of the will, and it was his duty to make a full and free disclosure of all the facts within his knowledge to Chapple, who was a beneficiary and sole heir at law, or at least to disclose all of them if he attempted to do so at all. Although a party may keep absolute silence and violate no rule of law or equity, yet, if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth. A partial statement, then, becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation. As bearing upon this phase of the controversy, a statement made by Gidney to Chapple several months after the will in his favor was signed is important. He testified in relation to this conversation:

"I think about January, 1906, Chapple came to my office and said, 'Mr. Gidney, has my mother made a will disinheriting me?' I told him she had not, so far as I knew, and he told me he had heard she had. I then reiterated the same response that she had not, so far as I knew."

This statement was at least misleading and deceptive. The will had been drawn, not, it is true, cutting Chapple off entirely, but giving him $500, and leaving the rest of the estate to Gidney. Whether the statement be technically true or not is a nice question as to the meaning of the word "disinherited." That it was practically untrue and calculated to lull Chapple into inaction and prevent him from interviewing his mother cannot be doubted. In this aspect, it relates itself convincingly to the fact of fraud and undue influence in the procurement of the will.

In the case at bar it cannot be said that the means of information were open to both parties alike. Gidney by reason of his confidential relation to the testatrix had special opportunities to acquire definite knowledge of everything pertaining to her estate. As a lawyer he was employed for this very purpose, and as a principal beneficiary under the will he had great personal reasons for knowing all about it. Besides this, he was executor, and it was his duty in this capacity to fully inform himself of all matters pertaining to the estate. 2 Pom. Eq. Jur. §§ 902-905-960; *Keen v. James,* 39 N. J. Eq. 527, 51 Am. Rep. 29; *Turner v. Harvey,* Jacob, 169, 178; *Peterson et al. v. Budge et al.* (Utah) 102 Pac. 211.

We further believe that the finding of the court below to the effect that the release and aquittance executed by Sidney Chapple was void should be sustained because of the concealment by Gidney of material facts known to him and not known to Chapple, such concealment to be considered in the following aspects: (1) Because under the specific facts and circumstances in the case the duty was upon Gidney to make a full and free disclosure for the reason that confidence on the part of Chapple is necessarily implied. (2) Because as attorney of Mrs. Rawlings, and as executor of her will, Gidney stood in a fiduciary relation to Chapple. (3) Because, having stated a part of his information, Gidney was under obligations to state all that was relative thereto. These propositions are supported by the authorities last above cited.

The evidence in this case is voluminous, and we do not deem it necessary to set it out in this opinion at more length than we have already done. We have examined it all with great care, however, and are of the opinion that the court below was justified in setting aside the report of the master upon the ground that his findings are clearly in conflict with the weight of the evidence upon which they were made. We are of the opinion that the master's findings are not supported by the evidence, and that it was not error to set them aside. The case was pending on the admission of the state, was ably tried below, and all the evidence

was taken and preserved in the record, and it was stipulated that, if necessary, it may be used in the trial of the will case. We know of no reason why the court should not have made findings in accordance with the weight of the evidence and render its decree thereon after setting aside the findings and report of the master.

The sixth finding of the court, and that part of the decree based thereon, should be modified by omitting the part that requires the plaintiff in error to execute to the defendants in error a reconveyance of all the property so conveyed to him. Plaintiff's amended complaint contains the following allegation:

"Plaintiffs say that if it should be shown upon the hearing that the five hundred and ten dollars ($510.00) received by the plaintiff Chapple from the defendant, Gidney, was not money belonging to the estate of Sarah Rawlings, but was money of the defendant, Gidney, that plaintiffs are willing to do equity, and will, upon the establishment of such facts by this court, repay such money with interest to the said Gidney, and are willing to have the relief awarded them by the court herein made subject to such repayment within a time fixed by the court."

We think this is a sufficient offer to do equity, and that the decree should be rendered in accordance with the offer, allowing the plaintiff a reasonable time to restore the consideration with interest, upon which the conveyances should be canceled. The diamond rings and earbobs which constitute part of the consideration for the conveyance, it is admitted, belong to the estate of Mrs. Rawlings, and are properly disposed of by the court by ordering them deposited with the clerk of the court, subject to the final disposition of the will case.

Pomeroy, treating the question of restoration of consideration, in section 688, states the rule as follows:

"In order to obtain the relief, the complainant must restore the other party to the condition in which he stood before the transaction. This requirement is based upon the maxim that he who seeks equity must do equity. In cases of fraud, if the defendant's act has prevented a complete restoration of the *status quo*, he cannot in justice urge this fact as a defense to the recission, but, in other cases, such as mistake, it would seem reasonable that the *status quo* should be completely restored as a condition of

equitable relief. Even in an action at law, 'if the thing received by the defrauded party be of no value, or if by reason of the act of the fraudulent party a return be rendered impossible, a return or tender is unnecessary. So also, where by natural causes or reasonable use the value of the property is diminished, and perhaps where it is necessarily destroyed in discovering the fraud, the fraudulent party must receive it in its depreceiated condition.' Neither is a party obliged to return that which he will be entitled to retain, even though cancellation be decreed  *  *  * Many of the courts have in dealing with this question completely lost sight of the plain distinction between the equitable remedy of rescission or cancellation (where, as in all equitv decrees, complete relief is awarded to the defendant as well as to the plaintiff) ; and the legal remedies, based upon rescission of a contract by the act of a party thereto, where, in the act of rescission itself, the plaintiff must restore or attempt to restore the consideration, since in legal theory the *ex parte* act of rescission reinvests him with the legal title to the thing for the possession of which he subsequently sues, and must therefore be conditioned upon a surrender of the thing already received by him in pursuance of the transaction which he thus avoids. Restoration or tender before suit is thus a necessary element in legal rescission, but is wholly superfluous as a prerequisite to the commencement of a suit in equity for rescission or cancellation; and insistence upon it as such prerequisite often works a complete denial of justice,  *  *  * where, for example, the complainant has spent the money consideration received by him before discovery of the fraud. As correctly holding that a tender or offer of restoration before suit is not necessay, see *Barker v. Walters,* 8 Beav. 92; *Jervis v. Nerridge,* L. R. 8 Ch. 351; *Thackrah v. Haas,* 119 U. S. 499, 7 Sup. Ct. 311, 30 L. Ed. 486; *Wenegar v. Bollenbach,* 180 Ill. 222, 54 N. E. 192, (but see *Rigdon v. Walcott,* 141 Ill. 649, 31 N. E. 158) ; *McCorkell v. Karhoff,* 90 Iowa, 545, 58 N. W. 913; *Thayer v. Knote,* 59 Kan. 181, 52 Pac. 433, (but see *State v. Williams,* 39 Kan. 517, 18 Pac. 727) ; *Thomas v. Beals,* 154 Mass. 51, 27 N. E. 1004; *Jandorf v. Patterson,* 90 Mich. 40, 51 N. W. 352; *Carlton v. Hulett,* 49 Minn. 308, 51 N. W. 1053; *Berry v. American Cent. Ins. Co.,* 132 N. Y. 49 [30 N. E. 254], 28 Am. St. Rep. 548; *Wells v. Houston,* 23 Tex Civ. App. 629, 57 S. W. 584; *O'Dell v. Burnham,* 61 Wis. 562, 21 N. W. 635; *Hansen v. Allen,* 117 Wis. 61, 93 N. W. 805. In a few cases it is also held that the complainant need not offer in his bill to do equity, since such offer is superfluous. *Knappen*

*v. Freeman,* 47 Minn. 491, 50 N. W. 533." (6 Pomeroy, Eq. Jur. pp. 1162-1165.)

This court in *Clark et al. v. O'Toole et al.,* 20 Okla. 319, 94 Pac. 547, held that:

"In an action for rescission and cancellation of a deed fraudulently obtained, an allegation in the petition that plaintiffs are ready and willing to execute and deliver a deed to the land traded for to defendants is a sufficient 'offer to restore' to bring them within the terms of section 827, Wilson's Rev. & Ann. St. Okla. 1903."

With the modification herein suggested, the findings and decree of the court below should be affirmed, and it is so ordered.

All the Justices concur.