Matter of the ESTATE of Arthur O. HOL-
LIDAY, also known as A. O. Holliday and
as Arthur Otis Holliday, Deceased.

George A. HOLLIDAY, Oliver M. Holliday,
M. G. Holliday, Lula B. Easley, Robert H.
Cobean and Merl Prunty, Jr., Plaintiffs in
Error,

v.

Helen H. Weightman HOLLIDAY,
Defendant in Error.

No. 37757.

Supreme Court of Oklahoma.

June 24, 1958.

Orel Busby, Ada, and S. J. Clendinning, Tulsa, for plaintiffs in error.

Richardson & Cavanagh, by E. L. Richardson, Lawton, for defendant in error.

BLACKBIRD, Justice.

This appeal involves the title to property acquired, during his life, by one Arthur Otis Holliday, hereinafter referred to as testator, who died at the age of 85 years, while a resident of Lawton, Oklahoma.

In his younger years, the testator was actively engaged as a farmer and stockman at Faxon, Oklahoma, but, in later years, moved to Lawton, where, in addition to retaining farm and cattle interests, he owned at least one commercial rental property, and other real estate.

In March, 1948, when the testator was 79 years of age, his first wife, Lottie, to whom he had been married 55 years, died. During her last illness, her niece, Helen Weightman, who, while a young girl, had lived at Lawton, but about 1910 had moved with her family to Los Angeles, returned to Lawton to help care for her. After Lottie's death, Helen returned to her California home, but shortly thereafter the testator visited her and her brother there,

and, on May 30, 1948, the two were married in Los Angeles. Helen was then approximately 60 years of age.

After the couple's return to Lawton, and, on August 23, 1948, Holliday executed a will bequeathing and devising a life estate in all of his property to Helen. The will further provided that the remainder of said property, or its sale proceeds, if sold, was to be equally divided between his brothers and a sister, except one property in Lawton, in which a nephew, Robert Holliday Cobean, was to have a life estate, with the remainder thereof going, upon said devisee's death, to his children. The will authorized the sale of the testator's "Farm Properties * * * at" Helen's "wish for her needs, but not all at once", whereupon the sale price thereof would be "divided One-Half to Helen and the remaining One-Half" being "equally divided among my brothers and sister living at the time * * *".

Later, on August 12, 1952, Holliday executed a new will, which he noted on the old one, "voided" it. The new will contained the same provision as the old one regarding sale of the "Farm Properties" except that, in the sale proceeds, the nephew, Robert Holliday Cobean, was to participate equally with the testator's brothers and sister. The new will also bequeathed the sum of $10 to each of the testator's nephews, except Cobean, and further differed from the old will in that, as to the property remaining at Helen's death, her brothers and sisters were to share in it equally with his.

In 1953, the testator had a sore on his back or left shoulder, which was diagnosed as of cancerous origin. Thereafter, the testator went to a Texas clinic where he was operated for the cancer, on July 30, 1953. On February 20, 1954, the testator and his wife executed three joint survivorship deeds to themselves on three parcels of the testator's Lawton real estate. The same month a new cancer lesion that developed in his arm pit was operated in Texas, where he was hospitalized approximately 20 days. After his return from Texas, and on July 21, of the same year, the testator and his wife executed to themselves 9 more joint survivorship deeds on other real estate the testator owned. In May, 1955, he was operated a third time at the Texas clinic again for cancer on the shoulder. Toward the latter part of December that year, the testator fell in his home, receiving a laceration on his head. Upon the advice of his local physician, Dr. Angus, he was then hospitalized in a Lawton hospital until about February 16, 1956, when he was returned to his home, where he died approximately five days later. Dr. Angus attributed his death directly to hypostatic pneumonia.

In July, 1956, the testator's surviving widow, and named executrix in both of his wills, filed her petition in County Court for the admission to probate of the last of said wills. This was contested by the testator's brothers, sister and nephews, who about the same time commenced, in the Superior Court, an action against the widow to nullify and cancel the above-mentioned twelve joint survivorship deeds. Thereafter, on September 27, 1956, the County Court sustained the widow's demurrer to said contestants' evidence, and entered its order admitting the aforesaid will to probate. After the contestants had appealed this order to the District Court, the aforesaid deed cancellation case in the Superior Court was transferred to the District Court, where it was consolidated with the appeal and trial de novo of the will contest proceedings. At the joint trial of these consolidated cases, the testator's brothers, sister and nephews, appearing herein as plaintiffs in error, but hereinafter referred to as appellants, introduced evidence calculated to support, among other things, the allegations they had made in both the will contest and deed cancellation case, to the general effect that Helen, hereafter referred to as appellee, had procured the execution of the aforesaid deeds and will in the furtherance of a design and scheme to deprive them of the share in testator's property that otherwise would have "passed" to them, and, at a time when the

testator was ill and mentally incompetent, and acting under her undue influence. At the close of the trial, the District Court, hereinafter referred to as the trial court, entered judgment in favor of the appellee, affirming the County Court's order admitting the will to probate and denying appellants the relief they had sought initially in the aforementioned deed cancellation case.

Appellants have perfected the present appeal, contending generally, under one proposition of error, that said judgment is "contrary to the great weight of the evidence and unsupported thereby."

As to the testator's testamentary capacity on August 12, 1952, when he executed the will admitted to probate, there was no conflict in the direct evidence. All three of the attesting witnesses, two bankers and a real estate and insurance man, all of whom had known the testator for periods ranging from 10 to 40 years, gave unequivocal testimony that the testator appeared to be fully competent at the time the will was executed in their presence. Dr. Angus, through Kiwanis Club membership, had known the testator several years previously but attended him for the first time professionally, when, in 1953, he examined the lesion between the shoulder blades on testator's back, and advised him "to put himself in the hands of some skin specialist or cancer specialist", and thereafter continued to serve testator professionally, when necessary, after his respective aforementioned operations in Texas, and including his last illness, testified in substance that the first time he noticed the testator "slowing up" or "weakening" mentally was in July, 1955. This physician's testimony was to the effect that at all previous times when he saw him, the testator was fully competent; and he indicated that the only time he considered him not so was when he was under sedation during his last illness, beginning in December, 1955. Other witnesses, including Mrs. Alva Gordon, who had known the testator many years and was with him frequently during his illness, gave testimony to the effect that the testator was mentally alert at all times except on a few occasions when he was in the hospital under sedation. Mr. Strecker, a tenant on one of the testator's farms, testified concerning some of the details of cattle, crop and lease transactions, he had with the testator for several years extending through the summer of 1955. The facts he testified to, and the testimony of Oklahoma Tire and Supply Company's manager, Mr. Malson, concerning a lease transaction on a business building, owned by testator, together with the evidence of the testator's part in making out his and his wife's rather complicated joint income tax return, indicated that the testator was not only a mentally competent farmer, but a good business man during that period. Without unnecessarily lengthening this opinion by detailing, or summarizing any more of the evidence tending to show the testator's testamentary capacity, and his mental competency at the time he and his wife Helen executed the deeds in question, or of the testimony introduced on behalf of the appellants to show the contrary, it is sufficient to say that we have carefully examined all of the evidence, and, under the rules, hereinafter cited, cannot disturb the trial court's judgment on those features of the case. Much of the testimony favorable to appellants was circumstantial and given by the appellants themselves. None of it pertained directly to the particular dates in question (In re Bennett's Estate, Okl., 324 P.2d 862, 867) and much of it concerned conduct of the testator that could have as reasonably been explained by his undisputed tendency toward deafness, and other physical infirmities accompanying his age, as by mental incompetence. Some of it attested to the testator's physical stamina better than any evidence introduced on behalf of appellee. In Amos v. Fish, 193 Okl. 406, 144 P.2d 967, 968, this court held as follows:

"1. The judgment of the trial court on the issues of testamentary capacity and undue influence, in proceedings to contest a will, will not be disturbed

unless it is against the clear weight of the evidence.

"2. In a will contest case, where due execution and attestation are established, a presumption of testamentary capacity arises, and the burden of proving unsoundness of mind of the testator is upon the contestant.

"3. A testator has a sound mind for testamentary purposes when he can understand and carry in mind, in a general way, the nature and situation of his property and his relation to those who naturally have some claim to his remembrance, and to those in whom, and the things in which, he has been chiefly interested. Mere showing that at time of execution his memory was bad and that he was physically weak, unaided by other evidence is insufficient to establish lack of testamentary capacity.

"4. Evidence of a testator's ailing or weakened physical condition is not proof in itself of his testamentary incapacity; in order to constitute such proof said condition must be shown to have rendered him incapable of understanding the nature and consequences of his acts at the time he made the will."

One of the more recent cases in which this court applied the above rules was Brown v. Brown, Okl., 287 P.2d 913, which, in some of its factual aspects, is similar to the present one. Appellants characterize themselves and testator as a "closely knit" family, but on the basis of the record, the complete applicability of this adjective may well be questioned. And, in this connection, owing to the apparent infrequency with which the testator saw some of the relatives he was said, in appellants' testimony, to have not recognized on certain occasions, we do not think his inability to do this was surprising, or abnormal. Such testimony, and many of the more or less trivial and insignificant circumstances related by most of appellants' witnesses, fall far short of establishing mental incompetency to execute valid deeds, or testamentary incapacity, under applicable rules.

The only medical testimony elicited by either side, containing direct and definite opinions that testator was mentally incompetent, or lacked testamentary capacity, was given in answer to questions asked three witnesses. Two of these were Dr. Cobean, an 84 year-old Wellington, Kansas Health Officer, who is the husband of one of the appellants, and Dr. Oliver M. Holliday, an approximately 83 year-old brother of testator. As pointed out by appellee's counsel, these hypothetical questions, as noted by the quotation from In re Rich's Estate, 79 Cal.App.2d 22, 179 P.2d 373–379, appearing in the case of In re Williams' Estate, 207 Okl. 209, 249 P.2d 94, 98, to be characteristic of such questions, generally contained assumptions of fact as to various inabilities of the testator not established by admitted, or wholly undisputed, evidence. It appears from portions of the colloquy between some of these witnesses and their inquisitors that they, especially the testator's physician, Dr. Angus, may have recognized this. That such questions readily lend themselves to eliciting the answer desired by the examiner, is graphically illustrated by the cross examination and re-direct examination of Dr. Angus. In their brief in chief, appellants say that this doctor very accommodatingly gave opposing counsel opposite answers to the same hypothetical question; but, by comparing the respective attorneys' questions, it is obvious that one contained assumptions of fact not found in the other. We think further discussion of this testimony unnecessary in view of the fact that it is generally regarded as the "weakest and most unsatisfactory" of evidence, and the further fact that the trial court evidently did not regard it as sufficient to discharge appellants' burden of overcoming the presumption of the testator's capacity (see Amos v. Fish, supra) and of outweighing the other testimony of Dr. Angus (who was the only one of the three doctor witnesses that had attended the testator professionally) and the considerable amount

of other evidence tending to establish such capacity.

The argument of counsel for appellants on the matter of the undue influence appellee was alleged to have exercised over the testator in the making of his last will, and more particularly in the drawing and execution of the aforementioned joint tenancy, or survivorship, deeds, is replete with biased inferences and conclusions drawn by them from certain circumstances, and certain excerpts of the evidence, most favorable to them. It would be unfair and inaccurate to say that all of them are without any foundation whatsoever. But certainly some are inferences upon inferences and conclusions about which all reasonable men could not agree. For instance, at one place in their brief, they concede that the record does not show who prepared the joint survivorship deeds that were executed July 21, 1954, but a few lines afterward, they say: "It is * * * obvious that defendant (appellee) did this typing or had it done." At another place in their briefs, counsel say:

"No deductions can be drawn from the testimony of numerous witnesses other than that the deceased was without the mental capacity to understand and comprehend the effect of joint tenancy deeds. Also, that the defendant was unhappy with the provisions of the second will and the fact that she had not been able to influence the deceased to leave all his property to her outright, so she *was insisting* that he make joint tenancy deeds to all his real estate; that she sought this method of getting around the will and to obtain the property in its entirety and without the necessity of even presenting the will for probate." (Emphasis ours.)

We cannot allow the above-quoted prejudiced deductions to overthrow the trial court's conclusions to the contrary. There is no evidence in the record establishing that appellee ever requested, or *insisted,* that the joint tenancy deeds be made, or executed; that she assumed any initiative

in the matter; or that such a thing was even her idea, instead of the free and unfettered idea and will of her husband, who, much of the testimony indicates, was, by nature, a man of independent decision and action. Instead of the testimony of "numerous witnesses", the only testimony bearing directly upon the question of whether or not the testator understood or comprehended the effect of the joint tenancy deeds was that of the attorney, W. W. Godlove, showing that he attempted to explain this to the testator more than once. We think this testimony is of no particular significance on that point, in view of the conceivable fact that many laymen of perfectly normal minds, and perhaps some more or less learned in conveyancing, might also experience difficulty in understanding that subject and remembering what is told them concerning it.

Appellants seek to distract attention from the dearth of evidence of appellee's alleged undue influence over the testator, by attempting to shift the burden to her of showing that the execution of the last will, and the joint tenancy deeds, was not her desire, but his. On the obvious hypothesis that the testator's and appellee's husband-wife relationship was a confidential one, they seek support for this argument in the following paragraph from Hunter v. Battiest, 79 Okl. 248, 192 P. 575, 579:

"When the legal presumption of undue influence has arisen by showing confidential relations, whether in disposition of property inter vivos or by will, the burden of proof is upon the party seeking to take the benefit of such disposition to rebut the presumption attaching thereto by showing either a severance of the confidential relations, or that the part making the disposition had competent and independent advice in regard thereto. Gidney v. Chappell, supra [26 Okl. 737, 110 P. 1100]; McQueen v. Wilson, 131 Ala. 606, 31 So. 94."

The rule indicated in the above quotation has been criticized as a "harsh" one (In

re Harjoche's Estate, 193 Okl. 631, 146 P. 2d 130, 132), and some courts refuse to follow it. 57 Am.Jur. "Wills", sec. 390. "Most of the authorities, however, support the view that a presumption of undue influence arises upon a showing that one who· drew the will, or was *otherwise active directly in preparing it or procuring its execution,* obtains under the will a substantial benefit, *to which he has no natural claim* or a benefit which, in amount, is out of proportion to the amounts received by other persons having an equal claim to participate in the bounty of the testator." Ibid. In this connection, see, also, Norris v. Bristow, 358 Mo. 1177, 319 S.W.2d 367, 11 A.L.R.2d 725 and the annotations at 154 A.L.R. 583 and 66 A.L.R. 228. In the Hunter case, supra, the court was dealing with a situation in which the sole beneficiary of the will was an attorney, who undisputedly had suggested testamentary disposition to the testator, was in a commanding position of power to grant one of the testator's last wishes, and did not have the natural place in the testator's affections that usually accompanies ties of marriage or consanguinity. That is not true of the appellee. As the testator's wife, she had a natural claim to his bounty and there is not a scintilla of direct evidence that she had anything to do with preparing, or procuring the execution of, either of the wills or any of the deeds. Any conclusion to the contrary must depend solely for its foundation upon speculation and the fact that the.appellee accompanied her husband on some of the trips having to do with such a plan of property transfer. In view of the foregoing, we hold that, under the circumstances of this case, appellee did not have the burden, because of her marital relationship with the testator, of proving the negative of the "undue influence" issue. In this connection, see Goertner v. Gardiner, 125 Fla. 477, 170 So. 112; In re Martin's Estate, supra; In re Lillies Estate, 195 Okl. 597, 159 P.2d 542. We agree with the trial court that the evidence was wholly insufficient to establish the affirmative of that issue. Said court's closing

oral remarks, in rendering the judgment,. quoted in appellants' brief, even if germane to any of the issues, would serve no effective purpose in their attempt to reverse· it. See Ralston v. Tucker, Okl., 324 P.2d 525; Hays Trucking Co. v. Maxwell, Okl., 261 P.2d 456, 462, and the cases therein. cited.

As we are convinced that the trial court's judgment is neither clearly against the weight of the evidence, nor erroneous. in any of the respects claimed, it is hereby affirmed.

WELCH, C. J., CORN, V. C. J., and DAVISON, HALLEY, JOHNSON and WILLIAMS, JJ., concur.