**PUTNAM CITY CO. v. MINNETONKA LBR. CO. et al.**

No. 10231—Opinion Filed July 24, 1923.

Rehearing Denied Sept. 25, 1923.

(Syllabus)

1. **Equity — Jurisdiction—Complete Relief —Legal Rights.**

Where a court of equity has obtained jurisdiction of the controversy for any purpose it will retain jurisdiction for the purpose of administering complete relief, and it may for this end determine purely legal rights which otherwise would be beyond its authority.

2. **Contracts—Right to Rescission—Partial Noncompliance with Contract.**

It is not every partial neglect or refusal to comply with some of the terms of the contract by one party which will entitle the other party to abandon at once the special and solemn obligation entered into by the parties, and by which they had made for themselves the law which was to control them. In order to justify an abandonment of the contract, and of the proper remedy growing out of it, the failure of the opposite party must be a total one; the object of the contract must have been defeated or rendered unattainable by his misconduct or default. For partial derelictions and noncompliance in matters not necessarily of first importance to the accomplishment of the object of the contract, the party injured must seek his remedy upon the stipulations of the contract itself. This rule is inflexible where the partial failure of performance is such as may be fully compensated in damages.

3. **Appeal and Error—Review of Equity Case—Findings.**

In an equitable action, the findings of the trial court should be sustained unless it appears that its findings are clearly against the weight of the evidence. The findings of the trial court should be strongly persuasive, and should not be set aside unless the Supreme Court can say, in equity and good conscience, that the conclusion reached by the trial court is clearly against the weight of the evidence.

4. **Same—Affirmance.**

Record examined, and held, that the judgment of the trial court is not clearly against the weight of the evidence, and it is therefore affirmed.

Error from District Court, Oklahoma County; Edward Dewes Oldfield, Judge.

Action by the Minnetonka Lumber Company against the Putnam City Company and others. From an adverse judgment, the Putnam City Company brings error. Affirmed.

Horace Speed, T. G. Chambers, Sam Hooker, and Stuart & Cruce, for plaintiff in error.

Everest, Vaught & Brewer and Keaton, Wells & Johnston, for defendants in error.

JOHNSON, C. J. This is an appeal from the district court of Oklahoma county; Hon. Edward Dewes Oldfield, Judge

On the 23rd day of March, 1918, the district court of Oklahoma county, in a certain cause wherein the Minnetonka Lumber company, a corporation, was plaintiff and Putnam City Company et al. were defendants rendered judgments and decrees affecting some 50 parties to the action, among which a judgment was rendered in favor of John W. Shartel and Henry Schafer in the sum of $176,765.72, with interest thereon from that date until paid at the rate of 7 per

cent. per annum, in which judgment it was further ordered and decreed that the same be a first and prior lien upon the several tracts and parcels of land described in the journal entry of said judgment, awarding an execution to enforce said judgment, and providing that if the same was not paid within 30 days orders of sale issue and that the property be sold and the proceeds of the sale be applied to the satisfaction of said judgment. From such judgment the Putnam City Company, a corporation, which for convenience will hereinafter be referred to as plaintiff in error, has appealed, making Shartel, Schafer, and Classen defendants in error, and for convenience they will hereinafter be referred to as such.

The plaintiff in error has assigned 16 specifications of error which, being briefly summarized, are as follows:

That the trial court erred in (a) denying a trial by jury; (b) awarding judgment on notes and mortgages of August 9, 1910; (c) declaring a lien on all the property; (d) refusing a rescission of the contract and a return to plaintiff in error of the purchase money paid and value of improvements instead of awarding judgment and damages; (e) refusing a rescission and return of the purchase money paid and value of improvements because of defendants in error's refusal to reinstate contracts of July, August, and September, 1909.

These errors are discussed by counsel for plaintiff in error under seven subheads, which are as follows:

"(1)  Breach by vendor of material provision of the contract entitles the purchaser to rescind.

"(2)  Where the vendor did not convey what formed the material inducement to the purchase, the contract should be rescinded altogether and not enforced with a ratable deduction of the purchase money.

"(3)  (a) The filing of the petition praying rescission manifests the intention clearly enough. A prior notice or demand is not necessary.

"(b) A tender by the vendee is not necessary where the vendor has not performed the terms of the contract and now cannot do so.

"(4)  In a suit by the vendor to foreclose a mortgage given to secure the payment of the purchase money, the vendee may rescind and set up that defense.

"(5)  On rescission by purchaser for cause authorizing a rescission he is entitled to restoration of the purchase money paid, with interest from time of payment unless some equity in the case requires a disallowance of the interest.

"(6)  Purchaser upon rescission is entitled to compensation for valuable improvements placed on the land in good faith.

"(7)  Where the vendee is entitled to the return of his purchase money, he is entitled to a lien upon the land for the repayment of same."

The controversies involved in this appeal grew out of several contracts between the parties named and their respective associates, which we designate as (1) contract of July 24, 1909, (2) contract of August 9, 1909, (3) contract of September —, 1909, and (4) contract of August 9, 1910.

These contracts appear all through the record in the case from its inception, and much has been said in the record and brief of counsel for the parties concerning the validity of these several contracts, and divergent views have been presented by counsel concerning such validity. Just why learned counsel should assume that any of said contracts were invalid is not apparent in the record. There is nothing apparent in the record that the parties to these contracts were not sui juris at the time the same were made, or that any one of the contracts was induced or procured by reason of fraud or deceit, or by mistake of the parties, or that any of the parties were overreached by the act or conduct of any other party, but, upon the contrary, the record clearly discloses that each and every of the parties were shrewd business men, in every way capable, and who had proved eminently succesful in their private business, insomuch so that it is reasonably fair to presume from the record that by their shrewedness and business acumen they had acquired property the probable value of which could not be estimated with six figures. Hence, we say that nothing appears in the record indicating why such contracts should be held to be invalid.

The trial court evidently took this view of the situation and undertook to hold the parties to these contracts bound as far as may be, and to adjust the equities of the parties within the situation as presented under the evidence adduced upon the trial. As hereinbefore stated, the original action was commenced on the 17th day of February, 1912, in the district court of Oklahoma county by Minnetonka Lumber Company against Putnam City Company, E. C. D'Yarmett, First State Bank of Oklahoma City, Carey College Development Company, and John W. Shartel to foreclose a ma-

terialman's lien upon a certain building situated on lots 11 to 20, inclusive, block 28, Putnam City addition to Oklahoma City.

Various parties appeared and filed pleadings and claimed liens, which were settled in the judgment of the trial court and are not now in question on this appeal. The only controversy here is between Putnam City Company, plaintiff in error, and defendants in error, Shartel and those associated with him.

On the 17th day of April, 1912, Shartel filed his answer and cross-petition, making numerous parties defendants and seeking judgment on the notes and foreclosure of the mortgage of August 9, 1910.

On the 19th day of October, 1912, Shartel, joined by Schafer as intervener, filed their amended answer and cross-petition, again setting up their notes and mortgage of August 9, 1910, and claiming a lien under the contracts of July, August and September of 1909, and finally asserting an equitable lien on all of the property arising out of the facts and circumstances of the various transactions. Their pleading, in other words, they state in their brief, assumed the form of a letter to the court telling the entire story, asking that upon consideration of all of the facts an equitable lien upon all of the land be decreed to exist in their favor.

Appellant filed an answer, and subsequently filed numerous amended answers and cross-petitions and amended cross-petitions, alleging, in substance, that appellee had breached the contracts of July, August, and September, 1909, in failing to furnish the street car service therein contracted for, and that by reason thereof it had become impossible to sell lots; that many purchasers were demanding their money back, etc., and that the street car service was the principal consideration and that without it the lands had no value except as agricultural lands; that the contract, notes, and mortgage of August 9, 1910, were invalidated and become of no effect by reason of the decision of the Supreme Court on November 15, 1910, and that the changed circumstances of the parties made it impossible to go back under the contracts of July, August, and September of 1909, and sought a rescission of the contracts because of the breach, as before stated, and that appellant have returned to it the money paid on the contracts and expended for improvements. In its last amended cross-petition, filed on the 18th day of May, 1916, appellant says:

"This company further shows to the court that by the terms of the contract of August 9, 1910, the obligations of the said contracts of July, August, and September of 1909, were expressly set aside, and made null, void, and of no effect. And the contract of August 9, 1910, provided that if the Supreme Court of Oklahoma should thereafter hold the location of the state capitol, under the initiative election aforesaid, illegal and void, then the mortgage and notes of August 9, 1910, should be null and void, and that the parties should enter into new written contracts restoring the status existing prior to August 9, 1910; and that said Supreme Court did thereafter so hold said vote and said removal to be null and void, and the parties never made any other contract, nor renewed the contracts of July, August, and September, 1909, but proceeded upon other lines of conduct without regard to the former contracts. That under these conditions the parties are in court, without any contracts, and are asking equity upon all the facts and circumstances of the transactions between them."

In plaintiff in error's brief is a concluding paragraph as to the relief it seeks, which says:

"The relief prayed for by these defendants is that which is permitted where the vendors do not carry out their agreement with the vendees, a return of the purchase money with interest from date of payment and repayment of the money for improvements and a lien on the land therefor."

The record discloses that in the spring of 1909, John W. Shartel, A. H. Classen, Henry Schafer, and J. W. Maney associated themselves together for the purpose of building an interurban street railway from Oklahoma City to Yukon, and from such point it was to be subsequently extended to El Reno, a point distant from Oklahoma City about 30 miles.

In order to better finance the project, Shartel and those associated with him purchased a strip of land along the route of said railway one-half mile wide and six or eight miles long, believing that the value of the land would be enhanced by building the road and that they would be able to sell it at a good advantage and would use the profits in financing the road. Title to the property was taken in the name of Schafer for the use and benefit of himself and those associated with him, and building the road and selling the land was soon begun.

About this time I. M. Putnam became interested in property in this section just northwest of Oklahoma City and began to buy it up, and in a short time had accumu-

lated large holdings. Putnam was a real estate operator with large experience. He had put on the market numerous additions to Oklahoma City with marked success. Oklahoma City at this time was growing very rapidly; real estate was very active and addition property very popular and attractive.

On the 24th day of July, 1909, Schafer, acting for himself and associates, sold certain of said lands to Military Park Development Company, and on the 9th day of August and the 24th day of September, 1909, he sold M. F. Owen certain other tracts, consisting in all of something more than 800 acres. In these purchases the Military Park Development Company and M. F. Owen were acting for the Putnam City Company, which was yet to be organized, and was organized on the 9th day of December, 1909. The purchase price of said land was $302,250 and deeds were given to some of it, or all of it, and mortgages on October 21st and November 22, 1909, and June 3, 1910, taken back to secure the purchase money.

Said contracts are all of like tenor, and provide, in substance, for platting the land into lots, blocks, streets, alleys, etc., and laying it out as an addition to Oklahoma City and putting it on the market. Also for the execution of release by the vendor on acreage · in tracts of not less than five acres upon payment of $300 per acre, and on resident lots $50 per lot and $100 per lot on business lots. Also for street car service in language as follows:

"It is further agreed that first party hereby guarantees that a street car line will be built and completed through said land and cars operated to and from business part of Oklahoma City within three months from date hereof on the right of way now graded through said land and that a local car service shall be maintained on said line to and from the business part of Oklahoma City on an average of at least one car each way every hour and that said service shall be maintained for at least five (5) years from time begun and that local stops shall be made by cars on said line to take on and let off passengers when there are passengers to take on and let off, at the east boundary line of the eastern portion of said land, at each section· line adjoining or touching said land, at the east line of the part of the land in the southeast quarter of said section fourteen (14), township twelve (12) north, range four (4) west, at point three blocks east of the western line of said section fourteen (14), and at a point six blocks east of the western line of said section fourteen (14), according to

the survey now made of said land, a plat of which has been furnished to second party; provided, however, that said places of stopping may be changed by mutual consent of the parties hereto. This the 9th day of August, 1909."

Immediately upon the execution of these contracts I. M. Putnam began to lay out a town site on the land an addition to Oklahoma City and to plat it into lots, graded streets, erect buildings, to make the usual town-site improvements and to make sales of the lots, and for this purpose he had in his employ a large corps of assistants. The Putnam City Company upon its organization succeeded to all these interests. In fact, I. M. Putnam was the Putnam City Company.

Oklahoma, having only been recently admitted into the Union, had not yet located its capitol city nor the particular spot of ground upon which it would erect its capitol building. On the 11th day of April, 1910, an election was called for this purpose and on the 11th day of June, 1910, said election was held, and Oklahoma City was selected as the capitol city, but said selection was contested in the courts and held in abeyance for some time, and finally declared invalid.

By the early summer of 1910 the real estate market in and about Oklahoma City was badly on the wane and the demand for addition property had become so badly demoralized that sales were difficult indeed. It was realized · by both Shartel and those associated with him, and the Putnam City Company, that something must be done to restore and stimulate the market, or else there was great danger that Shartel would not be paid for the land purchased and that Putnam City Company could not make a success of its townsite addition enterprise. Putnam City Company was now in default in its payments for the purchase of the land, and Mr. Shartel states that he realized that if Putnam did not get the capitol there was going to be a smash. It was therefore, mutually agreed that they should undertake to locate the state capitol on this property and at a point something like seven miles northwest of Oklahoma City, which is now known as Putnam City. On the 9th day of August, 1910, the parties entered into the following agreement:

"This Agreement made at Oklahoma City, Okla., this 9th day of August, 1910, by and between Putnam City Co., an Oklahoma corporation, hereinafter called first party. and John W. Shartel and Henry Schafer, hereinafter called second parties, and Military Park Development Company, a corporation,

hereinafter called third party, and M. F. Owens, hereinafter called fourth party.

"Witnesseth: In consideration of the release by said Schafer and third party, each the other, of and from the obligations of a certain contract between them, dated July 24, 1909; and of the release by said Schafer and fourth party, each the other, of and from obligations of two certain contracts between them, said contracts being respectively dated August 9, 1909, and the 24th day of September, 1909; and in consideration of the release by the Interurban Traction Company of a certain mortgage dated October 21, 1909, given by the Military Park Development Company to said Traction Company, which mortgage is recorded in the office of the register of deeds of Oklahoma county, state of Oklahoma, in mortgage book 90 at page 323; and in consideration of the release by said Shartel of a certain mortgage given to him by M. F. Owens dated November 22, 1909, and recorded in said office in mortgage book 95 at page 608; and in consideration of the release of a certain mortgage dated June 3, 1910, and recorded in said register's office in mortgage book 93 at page 140; and in consideration of the execution of a certain mortgage dated August 9, 1910, by first party to said Shartel and the execution of the notes thereby secured in favor of said Shartel having delivered or caused to be delivered deeds to first party or to the state of Oklahoma conveying the property concerning which the three contracts first above mentioned were made, it is agreed by and between the parties hereto that in event it should be decided by the Supreme Court of the state of Oklahoma that the location of the state capitol at Oklahoma City under the initiative measure voted upon on the 11th day of June, 1910, was and is illegal, void and of no effect, then each and every of the contracts, mortgages which are or have been released as hereinbefore enumerated shall be restored to their respective conditions and effectiveness as before the execution of such releases, and each of the mortgage notes, deeds and other instruments and conveyances executed and delivered by the parties or any of them to this agreement altering or in any way changing the status of the above referred to agreements and mortgages as existing prior to August 9, 1910, shall be canceled and discharged, each of the parties hereto agreeing to make, execute, and deliver such instruments in writing as will effectively restore the property and rights and obligations of the parties to the condition and situation in which they existed prior to said August 9, 1910; it being the purpose and intention of this agreement in event the decision of the Supreme Court of Oklahoma should be adverse to the location of the capitol of the state of Oklahoma under the said initiative measure at Oklahoma

City, to restore each the other to his condition and status as existing before said August 9, 1910, in so far as such condition and status is concerned with any of the property or rights covered or dealt with in the said first three contracts and first three mortgages hereinbefore referred to.

"In Testimony Whereof, the parties have hereunto signed their respective names the day and year first above written.

"(Corp. Seal)     Putnam City Co.,

"By I. M. Putnam, President.

"(Corp. Seal).

"Attest: M. F. Owens, Secretary. John W. Shartel, Henry Schafer, Military Park Development Co. By President.

"Attest: Secretary M. F. Owens."

Pursuant to this agreement, Putnam City Company, as successor of M. F. Owens and Military Park Development Company, and John W. Shartel, as representing himself and those associated with him, ascertained and fixed the sum due under the contracts of July 24th, August 9th, and September 24, 1909, heretofore mentioned, which was found to be $201,101.78. A series of notes were executed by Putnam City Company on the same date to Shartel and mortgage as security for same on something less than one-half of the property covered in the contracts of July, August, and September, 1909. Deeds to the remainder of the property were placed in escrow to be delivered to the state upon the condition of the state capitol being located on the same, Shartel stating that the part of the property embraced in the mortgage of August 9, 1910, was better security for the amount due him with the capitol than all of the property without it.

On the 15th day of November, 1910, in the case of Smith, Secretary of State, et al. v. State ex rel. Hepburn, 28 Okla. 235, 113 Pac. 936, the Supreme Court held that the initiated bill by which it was attempted to locate the state capitol had not been adopted by the people at the polls. While this decision was somewhat discouraging, no doubt, nevertheless, hope survived, and the parties immediately undertook to locate the state capitol through the extraordinary session of the Legislature which convened in Oklahoma City on the 28th day of November, 1910, and continued their efforts until their proposition was finally rejected by the State Senate on the 14th day of December, 1910.

It seems quite clear to us that the cause presented to the trial court, by reason of the issues formed by the pleadings and

the evidence adduced upon the trial, a jury having been waived, was one of purely equitable cognizance and was within the rule frequently announced by this court in such a situation, that where a trial court sitting as a court of equity had acquired jurisdiction of the parties and of the subject-matter upon any theory for the purpose of doing equity between the parties, it would retain such jurisdiction and accord to the parties such relief as the court might find that the parties were in equity entitled to receive. 1 Pom. on Equity (3rd Ed.) 342; Murray v. Speed, 54 Okla. 31, 153 Pac. 181; 1 C. J. 616; Elliott on Contracts, 2461; West v. Madansky, 80 Okla. 161, 194 Pac. 430.

The trial court found in favor of the defendants in error in the sum of $187,101.78, which was the amount due upon the original amount stated in the contract of August 1, 1910—$207,101.78, less credits, with interest from August 9, 1910; amount in all, $286,265.72; and that the plaintiff in error was entitled to the sum of $75,000 as damages sustained by it on account of failure of the car service, with interest thereon from August 9, 1910, amounting in all to $109,500, which being credited on the total amount found to be due the defendants in error, left the amount due them of $176,765.72, for which judgment was rendered, as hereinbefore stated.

The court made numerous other findings and entered orders and decrees adjusting the rights of the other parties to the action, and which it is not necessary to notice, as the same became final and are not involved in this appeal, and further ordered that from and after such sales or either of them and the confirmation thereof by the court, all the parties to the action, plaintiffs, defendants, and interveners, and all parties claiming by, through, or under them or either of them, be barred and foreclosed and enjoined from having or claiming any right, title or interest in or to the premises so sold or any part thereof adverse to the interests of the purchasers at such sale or sales.

The objection urged to the findings and judgment of the trial court by counsel for plaintiff in error is stated in their brief as follows:

"At the trial before Judge Oldfield the court dispensed with the jury, and found that the claim of the Putnam City Company, that the Schafer interests had violated their agreement as to car service, was true. That being true, the Schafer and Shartel interests had no right to foreclose that mortgage, and it being true that they had violated that contract, it necessarily resulted that the Putnam City Company had the right to rescind and ask back its money, which it did. It was not a question of damages and counter damages, but it was a proposition that a contract had been made, and that the vendor had failed to give the consideration stipulated to be given, to wit, the car service; and it was not for them to make a different contract or to order that the vendee must exchange damage with the vendor; but the contracts having been broken by the vendor, that is to say the promises to furnish car service having failed, the vendee had the right to declare a rescission and ask back its money."

The force of counsel's logic is that, the court having found that the contracts had been breached by a failure of the defendants in error to furnish a complete car service for which the court awarded the plaintiff in error the sum of $75,000 damages, it therefore follows that the court was without authority to enforce the performance by the parties of the other provisions of their contracts, and that the same must be rescinded in whole as the plaintiff in error claims in its last amended pleading, and that the plaintiff in error should have been allowed to recover back all sums of money paid upon the contract of purchase of the properties or expended in improvements thereon, and that it should have an equitable lien declared upon the properties to secure the payment of the amount thus found to be due, and that, too, regardless of whether or not the plaintiff in error had done anything on its part giving them a right to rescission in the way of promptly seeking rescission or a restoration of the benefits received by it and a showing that it was in position to restore the status quo of the parties. Such is not the rule of equity as laid down either by the text-writers or the courts of the country.

It will be seen that the trial court found by its judgment that the failure to furnish car service was a partial breach and one that could be properly compensated for in damages.

The rule is that:

"Rescission of a contract is not permitted for a casual, technical, or unimportant breach or failure of performance, but only for a breach so substantial as to tend to defeat the very object of the contract."

1 Black on Rescission and Cancellation, sec. 197:

"A partial failure of performance of a contract will not give ground for its rescis-

sion unless it defeats the very object of the contract or renders that object impossible of attainment, or unless it concerns a matter of such prime importance that the contract would not have been made if default in that particular had been expected or contemplated. In an early and leading case it was said: 'It is not every partial neglect or refusal to comply with some of the terms of the contract by one party which will entitle the other party to abandon at once the special and solemn obligation entered into by the parties, and by which they had made for themselves the law which was to control them. In order to justify an abandonment of the contract, and of the proper remedy growing out of it, the failure of the opposite party must be a total one: the object of the contract must have been defeated or rendered unattainable by his misconduct or default. For partial derelictions and noncompliance in matters not necessarily of first importance to the accomplishment of the object of the contract, the party injured must seek his remedy upon the stipulations of the contract itself." This rule is inflexible where the partial failure of performance is such as may be fully compensated in damages."

1 Black on Rescission and Cancellation, sec. 198.

Plaintiff in error quotes section 984, Revised Laws 1910, to the general effect that a contract may be rescinded for a failure of consideration, but for some reason fails to quote paragraph 986, defining the duty of a party attempting rescission the first subdivision of which provides:

"He must rescind promptly upon discovering the facts which entitle him to rescind, if he is free from duress, menace, undue influence, or disability, and is aware of his right to rescind."

"It is also required of a party seeking the rescission of a contract that he should act with reasonable promptness, and he cannot claim relief in this form if he has acquiesced in the existing condition of affairs for so long a time that the rights or interests of the other party would be seriously compromised by a rescission, or until the rights of third persons have intervened." 1 Black on Rescission and Cancellation, sec. 197.

"In an action by the vendees of land to rescind the contract it appeared that defendant agreed to pipe water to the land, which it failed to do; that plaintiffs agreed to clear and plant to fruit trees one-half the land within seven months, and the balance within a year thereafter; that they knew that water was needed as soon as trees or vines were planted, but they planted half the tract during the first season; that, though no water was piped and two-

thirds of the trees died, they planted the other half the following season; and that they did not serve notice of rescission on defendant until they had been in possession over two years, and were in default on three installments of the purchase money. Held, that plaintiffs were not entitled to rescind because of defendant's failure to pipe the water." Fountain et al. v. Semitropic Land & Water Co. (Cal.) 34 Pac. 497.

"He must restore to the other party everything of value which he has received from him under the contract; or must offer to restore the same upon condition that such party shall do likewise, unless the latter is unable, or positively refuses to do so." Revised Laws 1910, sec. 986.

"In practically all cases of rescission, restoration of the status quo is an essential prerequisite to the right to rescind. And rescission for nonperformance is no exception to this rule. If the situation of the parties has been so changed by a partial performance of the contract, or by their arrangements for carrying it out, or by their actions taken in reliance upon its expected execution, that they cannot be restored without loss to their former situation, as if the contract had not been made, then a rescission cannot be had, but the remedy for damages occasioned by nonperformance must be sought in some other form." 1 Black on Rescission and Cancellation, sec. 197.

"A party claiming a rescission of a contract must restore or offer to restore everything of value which he has received under said contract from the other party.

"A party entered into a contract with a second party to deed him real property on a certain date, and at the same time the second party executed a note in payment for said property. In order to rescind the contract the note must be restored to the maker, or an offer made to restore." Moore v. Kelly, 57 Okla. 348, 157 Pac. 81.

"It is to be noted that the rule requiring restoration of whatever has been received under the contract does not in any way depend upon the ground or reason for the rescission." 2 Black on Rescission and Cancellation, sec. 617.

"It is universally agreed that rescission is not allowable by self-help or in an action at law unless the party seeking to rescind can and does first restore or offer to restore anything he has received under the contract, but the construction of this rule is far less severe than in England. Though it is frequently said that 'A contract cannot ordinarily be rescinded unless both parties can be reinstated in their original situation in respect of their contract, and if one party have already received benefit from the contract he cannot rescind it wholly,

but is put to his action for damages,' or the like, yet some courts have gone very far in allowing rescission upon restitution in specie of what had been given in spite of benefits derived from temporary possession" 3 Williston on Contracts, sec. 1460.

"The right to rescind a contract, whether on the ground of fraud or for any other sufficient reason, may be waived, and such waiver will not only prevent the party from thereafter maintaining any proceedings for the rescission of the contract, but will also debar him from interposing the same facts in defense to an action upon it. A waiver, by any party fully aware of the facts and of his rights in the premises, may be effected by express words or declarations, or by any acts or conduct which unequivocally show his intention not to insist upon the fraud or other ground of rescission, or to abide by the contract notwithstanding such grounds." 2 Black on Rescission and Cancellation, sec. 590.

"If a person, after acquiring knowledge of circumstances which would justify him in rescinding a contract to which he is a party, makes any declaration or does any act which distinctly recognizes the contract as still subsisting and as binding upon him, he will be held to have waived his right to rescind. Thus, where the contract remains executory, entirely or in part, and a party to it discovers that he has been defrauded or deceived, but nevertheless continues to operate under the contract or to perform acts in performance of his obligations under it, it is a condonation of the fraud or deceit and an affirmance of the contract which will prevent him from afterwards seeking to rescind it." 2 Black on Rescission and Cancellation, sec. 594.

"If a party originally possessing a remedial right has obtained full knowledge of all the material facts involved in the transaction, and has become fully aware of its imperfections and of his own rights to impeach it, or ought, and might, with reasonable diligence, have become so aware, and all undue influence is wholly removed so that he can give a perfectly free consent, and he acts deliberately, and with the intention of ratifying the voidable transaction, then his confirmation is binding, and his remedial right, defensive or affirmative, is destroyed. If, on the other hand, the original undue influence still remains or if the act is simply a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts and of his own rights, no act of confirmation, however formal, is effectual. The voidable nature of the transaction is unaltered." Gidney v. Chapple, 26 Okla. 737, 110 Pac. 1099.

"A. entered into a contract with B. wherein A. agreed, for a certain consideration to be paid at that time, to deed B. certain property. It was agreed that time was the essence of the contract and that the contract should be void at the option of A. if B. failed to pay the amount due on that date. B. went into possession of the property and defaulted in payment. A. took no steps to rescind the contract until about two years afterwards. Held: (a) A. waived his right to rescind by not exercising his option within a reasonable time after the default. (b) Before A. could rescind after such waiver, he must give B. timely notice of his intention to rescind and fix a certain and reasonable time within which he would be required to perform his part of the contract. (c) After such a notice B. could avoid the rescission by complying, before the date fixed, with the terms of the contract." Moore v. Kelley, 57 Okla. 348, 157 Pac. 81.

"Where one, who has been induced into a contract by fraud, after discovery of the fraud, with full knowledge of the facts and of his own right to impeach the contract for fraud, or who ought to, or might, with due diligence, have been aware of such right, proceeds to the execution of the contract and receives and retains the consideration therefor, he thereby ratifies the contract and cannot thereafter set up the alleged fraud as ground for cancellation or rescission." Cash v. Thomas, 62 Okla. 21, 161 Pac. 220.

"Where plaintiff purchased property for speculative purposes, held, advertised, and offered it for sale at a price above that which he was to pay for it, during the time when the real estate market was feverishly active and he might reasonably expect a sale at an increased price, and after the market suffered a partial collapse and became somewhat stagnant, attempted to rescind the contract of purchase because of an alleged misrepresentation made in connection therewith, though he had full knowledge of the facts months before, he was precluded by his laches." Kornblum v. Arthurs, 154 Cal. 246, 97 Pac. 420.

In 30 L. R. A. (N. S.) 872, is a note on waiver of purchaser's right to rescind contract for purchase of real property, in which scores of cases are collected, to the effect that:

"It is fatal to the right to rescind unreasonably to delay taking steps to that end, or thereafter to treat the property as his own, or recognize the validity and binding effect of the contract."

"Parting with a portion of the consideration after discovery of the ground for rescission is not only evidence of a ratification of the transaction, but also may deprive plaintiff of the power to place defendant in status quo." 9 Corpus Juris, 1213.

"If a party to a contract, having knowledge of fraud practiced upon him in regard to it, or of the other's breach of it or inability to perform it, negotiates with such other party, or enters into additional stipulations in reference to the contract, he thereby waives his right to rescind it for any cause then known to him." 2 Black on Rescission and Cancellation, sec. 613.

"A decree for the rescission of a contract or the cancellation of a written instrument is not granted as, of course, even when the jurisdiction of the court is undoubted. Applications for such relief are addressed to the just and sound discretion of the court, to be exercised, it is true, in conformity with established principles and precedents, but still having a regard to the specific facts before the court, and seeking to determine what is reasonable and proper under the circumstances of the particular case; and, moreover, in the exercise of such discretion, the court has power to impose on the complainant, under penalty of having his bill dismissed, such terms as it may deem that justice requires, as, for instance, that he shall restore all that he has received under the transaction proposed to be rescinded." 2 Black on Rescission and Cancellation, sec. 644.

"It is a general rule that a court of equity will not interfere to order or enforce the rescission of a contract or decree the cancellation of a written instrument where the law affords the complaining party a plain, adequate, and complete remedy for the injuries he claims to have suffered. * * *

"For similiar reasons, a bill in equity for cancellation of a conveyance is not the proper remedy for injuries suffered by the breach of a condition subsequent or by the failure to redeem promissory representations which do not go to the entire consideration, since the injured party can be adequately compensated by an award of damages in an action at law. So, also, failure to perform a contract, or a negligent, insufficient, or unsatisfactory performance of it, will not justify the interposition of a court of equity, on the ground that the law affords no adequate relief, unless, perhaps, in exceptional cases, where it can be shown that irreparable injury will result from the application of any other remedy than a complete rescission of the contract." 2 Black on Rescission and Cancellation, sec. 645.

"And, to generalize the rule a little, rescision for nonperformance cannot be claimed when there are circumstances in the particular case which would render such a course inequitable." 1 Black on Rescission and Cancellation, sec. 197.

Plaintiff in error does not contend that substantial restoration to the status quo would be possible in this case, but seeks to evade the necessity for restoration by the claim that it is prevented from restoring in part by action taken with the consent of the vendors. Restoration is a condition to rescission, and where restoration is impossible, rescission is impossible, and it does not matter why it is impossible to restore. No authority is cited, and. we are sure none could be found, to the proposition that a party may have rescission of a contract for the purchase of property without restoring the property purchased, merely because he has already disposed of it to third parties with the consent of the vendor.

As we view the record, the plaintiff in error's whole case for a reversal of the judgment of the trial court rests upon its right to a full and complete rescission of the contracts in question, and recover back all monies paid upon purchase price of the property and laid out and expended in improvements thereon. As we have seen, the trial court found otherwise; that is to say, that there was a partial breach of the contracts, the failure to furnish car service, and that the damages thereby accruing to the plaintiff in error amounted to $75,000, which was credited upon the amount the court found to be due the defendants in error under the contract.

From an examination of the entire record, we are unable to say that these findings of the trial court were against the clear weight of the evidence, and under these circumstances the judgment of the trial court must be affirmed, and it is so ordered. Weaver v. Drake, 79 Okla. 277, 193 Pac. 45; Black v. Donelson, 79 Okla. 299, 193 Pac. 424; Wyatt v. Shackleford, 79 Okla. 325, 193 Pac. 427; Potter v. Ertel, 80 Okla. 67, 194 Pac. 201.

NICHOLSON, COCHRAN, HARRISON, and MASON, JJ., concur.