Mrs. Betty **PRESGROVE**, Executrix of the Estate of Nellie Robbins, Formerly Barnes, Deceased, Plaintiff in Error,

v.

B. D. **ROBBINS**, Defendant in Error.

No. 42688.

Supreme Court of Oklahoma.

Jan. 21, 1969.

Rehearing Denied April 1, 1969.

Brown, Brown, Brown & Hackler, Mc-Alester, for plaintiff in error.

Stipe, Gossett & Stipe, McAlester, for defendant in error.

BLACKBIRD, Justice.

This action arose out of a controversy between plaintiff in error, a daughter of the late Mrs. B. D., or Nellie, Robbins, by her predeceased first husband, the late Thomas S. Barnes, and defendant in error, B. Dan Robbins, Nellie's second, and only surviving, husband, over the ownership of

a 1963 Ford Sedan purchased and used by the said Mr. and Mrs. Robbins during their marriage, a balance of $1040.94 in a joint checking account in The National Bank of McAlester, at the time of Mrs. Robbins' death on May 21, 1965, and more than $19,000.00 in two savings accounts in the Phoenix Federal Savings and Loan Association, all three of which accounts bore the names of both Mr. and Mrs. Robbins. Basically, plaintiff in error's theory seems to be that this automobile was purchased, and these accounts were derived from the income, and proceeds, of her father's estate, which, after his death, were held in trust by her mother, Nellie, under a sort of lifetime proprietorship for the benefit of the couple's surviving children. Defendant in error claims that this personal property was derived from some of his own funds and from gifts of money to him by Nellie under joint tenancy arrangements.

Mrs. Robbins' above named first husband, Barnes, died intestate in March, 1948, leaving approximately 1400 acres of Pittsburg County land (hereinafter referred to as the "Barnes land") on a part of which he and Nellie resided, near Adamson, Oklahoma. Besides plaintiff in error, and her mother, Nellie, said intestate, Barnes, was survived by three sons, namely: Henry Harold, Thomas J., and Robert Allen. Either before, or after, the close of the administration proceedings covering the Barnes estate, these surviving siblings, all of whom were then adults, except plaintiff in error (hereinafter referred to as "plaintiff") who, at that time, was under the legal impediment of minority, relinquished to their mother, Nellie, their inherited interests in their father's estate. After plaintiff became of age and was no longer under the guardianship of her said mother, she also conveyed her interest to Nellie.

Thereafter, on a trip to California in the summer of 1956, Nellie became acquainted with defendant in error (hereinafter referred to as "defendant"), a former Oklahoman who had then resided in Los Ange-

les several years, and whose second wife, the former Martha Gough, had died as recently as June 17, 1956. Preparatory to marrying defendant, Nellie, upon her return home from California, procured the drafting of a written instrument entitled "ANTENUPTIAL AGREEMENT" to be signed by her and the defendant. After this agreement was mailed to him from Oklahoma, defendant signed it before a Los Angeles Notary Public, on September 21st of that year, and, upon its return to her in Oklahoma, Nellie signed the instrument before a Pittsburg County Notary, a few days later. The pertinent part of said agreement reads as follows:

"* * * the said Dan Robbins and Nellie Barnes, hereby agrees, covenants and declares it to be his and her desire that during their marriage each of them shall be and continue completely independent of the other as regards the enjoyment and disposal of all property owned by either of them at the commencement of the marriage, and each of them hereby agrees and covenants with the other, in view and consideration of their proposed marriage that so far as it is legally possible by their private act and agreement, *all the property belonging to Nellie Barnes at the commencement of the marriage shall remain her individual property to be held exclusively by her and be subject to her disposition* as her separate property in the same manner as if the said proposed marriage had never been celebrated.

"It is mutually agreed between the parties hereto that Dan Robbins will at no time claim any portion or interest in the property owned by Nellie Barnes at the commencement of said marriage, and in consideration of the premises, promises and covenants of each, it is agreed herein that Dan Robbins *does not now assert any claim or interest in the property owned by Nellie Barnes, nor will he do so during the coverture of the contemplated marriage, nor will he receive or claim any portion or interest in said property upon the death of the*

*said Nellie Barnes unless she should specify and set out said interest by a will, \* \* \**

\* \* \* ." (Emphasis added).

Thereafter, Nellie returned to California and, later, she and defendant were married on October 13, 1956, at Las Vegas. He was then sixty-eight years of age, and she was a few years younger. After their return from the wedding trip, they resided in the same Los Angeles home in which defendant and his former wife, Martha, had lived together, and defendant continued to work as a "trimmer" for the Yellow Cab Company, in that City.

In May, 1957, the Los Angeles home was sold, and the couple returned to Pittsburg County to live at the Barnes' homestead.

Shortly thereafter, defendant, through Mr. Priddy of the National Bank of McAlester, transferred to that bank, from his California bank, the sum of $6578.17, derived from the sale of his equity in his Los Angeles home, plus the proceeds of his terminal wage check from the aforesaid Yellow Cab Company, with which a joint tenancy checking account for him and his wife was established in said McAlester bank, on May 17, 1957.

Some time thereafter, defendant applied for, and started receiving Social Security benefits of $167.67, of which $52.00 represented Nellie's entitlement, as his wife.

In 1960, plaintiff who was then, or had been married to a man named "Johnston", and lived in Duncan, accepted a loan from Nellie of some $6,000.00 to buy some land near that City, and thereafter repaid only $800.00 of it.

On July 3rd, 1961, Nellie and the defendant opened a joint savings account in Phoenix Federal Savings and Loan Association, at McAlester (hereinafter sometimes referred to merely as "Phoenix Federal" or "Savings and Loan Association"), with an initial deposit of $7500.00. This account was designated as Account "No. 3033".

In the same year, Nellie and the defendant purchased a house in Haileyville for $3,000.00, and, after remodeling and improving it, sold it that Fall to a Mr. and Mrs. Roscoe Ward for about $4,000.00. On the sale price, the Wards made a down payment of $500.00, and, for the balance, gave Nellie and the defendant their promissory note due January 1, 1969, secured by a real estate mortgage on the property. The mortgagees named in said encumbrance were: "B. D. Robbins and Nellie M. Robbins, husband and wife, as joint tenants and as tenants in common with right of survivorship." By arrangement with the aforesaid McAlester Bank, Mr. and Mrs. Ward's payments of $50.00 per month on this obligation are still being received by said Bank, and deposited in the aforementioned joint checking account.

On June 14, 1962, by a check dated that date on hers and the defendant's joint bank account, Nellie gave plaintiff $4,000.00, thus supplementing the aforementioned $6,000.00 she had given her, originally, as a loan, only a small part of which had been repaid, as aforesaid.

In July, 1962, Nellie received a check in the amount of $46,850.00 which she deposited in the couple's aforementioned joint bank account, in payment for a majority of the Barnes land (probably almost 1300 acres), that was condemned by the United States Government for the construction of Lake Eufaula.

On July 5, 1962, Nellie opened a joint savings account at Phoenix Federal in the name of herself and her aforementioned son, Allen, with an initial deposit of $2,000.00. The number given this account was: "3429". By a check dated July 27, 1962, drawn on the aforesaid bank account, she made her son, Thomas, a gift of $10,000.00.

At some time prior to August 23, 1962, Nellie gave her son, Henry, 80 acres of the Barnes land, in return for which, he promised to make her a garden and give her a fat calf every year as long as she lived.

On August 23, 1962, Nellie, accompanied by defendant, went to the office of one of plaintiff's present attorneys, Preslie Brown, where separate wills were drafted for, and executed by, them. Nellie's will, in so far as may be material to the present controversy, reads as follows:

"* * *

"I further wish to state and declare that on or about the 21st day of September, 1956, I entered into an Antenuptial Agreement with one Dan Robbins, one and the same person as B. D. Robbins, which said indenture is hereby made a part of this Will by reference as fully as if repeated at length herein, and that on or about the 13th day of October, 1956 we were married. It is my further wish and desire that said Antenuptial Agreement, above mentioned, be recognized, by my legal heirs, and said husband, and varied or changed only as in this Will provided. I further declare that I have four beloved children, to-wit:

"Henry Harold Barnes, Route 5 McAlester, Oklahoma,

"Robert Allen Barnes, Victorville, California,

"Betty Marie Pressgrove, Duncan, Oklahoma, and

"Thomas K. Barnes, Adamson, Oklahoma.

"1. I direct that all my just debts and funeral expenses be paid as soon after my death as can conveniently be done.

"2. I give, devise and bequeath to my said husband, B. D. Robbins, the home or dwelling where we live, and the twelve or fifteen acres on which it is situated, together with all household furniture, furnishings, equipment, dishes, linens and silver located therein, for so long as he lives, specifically devising to him a life estate in and to said real estate and further providing that he maintain same and pay taxes and insurance thereon during his life time, and that upon his death said home and the tract on which it is situated, comprising some twelve to fifteen acres of land, be sold and the money divided as hereinafter provided.

"3. It is my further desire and I devise all the other real estate standing in my name to my children, to-wit: Robert Allen Barnes, Thomas J. Barnes, sons, and Betty Marie Pressgrove, my daughter, in equal shares, share and share alike, to the exclusion of my beloved son, Henry Harold Barnes, I having made a settlement of land to him and he being well fixed in that regard.

"4. All of my other property, together with the money coming from the sale of the homestead upon the death of my husband, I give, devise and bequeath to all of my children, to-wit:

"Henry Harold Barnes

Robert Allen Barnes

"Betty Marie Pressgrove

Thomas J. Barnes

in equal shares, share and share alike.

"5. It is my wish and desire and I so direct that my beloved daughter, Betty Marie Pressgrove, be and she is hereby named Executrix of this my Last Will and Testament, to serve without bond.

* * *."

Thereafter, by a check dated September 5, 1962, made payable to Phoenix Federal, and signed by defendant, the sum of $12,000.00 was withdrawn from Nellie's and defendant's bank account. With $6,-000.00 of this check's proceeds a new savings account was opened the same day in the names of Nellie and the defendant, in Phoenix Federal as account No. 3522. With the remaining $6,000.00 of the check's proceeds, two other accounts in Phoenix Federal were created under the names of Nellie and her son Henry (account No. 3524), and Nellie and her son Thomas (account No. 3523), respectively, with initial deposits of $3,000.00 in each. Thereafter, on November 5, 1962, by another check made payable to Phoenix Federal and signed by defendant, another $10,000.00 was withdrawn from his and Nellie's joint

bank account. The same date, the balances in the above described accounts in said Savings and Loan Association were increased by the following deposits: $2,000.00 to Account No. 3033, $4,000.00 to Account No. 3429, $2,000.00 to Account No. 3522, $1,000.00 to Account No. 3523, and $1,000.00 to Account No. 3524.

Thereafter, on August 13, 1963, another check—this one in the sum of $900.00—was drawn on the aforesaid joint bank account by defendant, made payable to Phoenix Federal, and on the same date, $500.00 was deposited in said Savings and Loan Association's account No. 3524, and another $500.00 in its account No. 3523. On December 3, 1963, another such check was drawn in the amount of $2,000.00; and both the notations on the check, and the entries in the savings account books, indicate that this check's proceeds were deposited in equal amounts of $1,000.00 each in Phoenix Federal Accounts No. 3523 and No. 3524, supra.

At some time between December 31, 1963, and March 1, 1964, the account books for all of the hereinbefore described savings and loan accounts, which Nellie and the defendant had been placing in a "secret panel" of a locked desk in their home (when not in use for the making of deposits and withdrawals or the entry of dividend payments) were misplaced. When Phoenix Federal was notified of this, it changed the numbers on the accounts (Account No. 3033 and 3522, in Nellie's and the defendant's names being changed to "4249–SM" and "4251–SM", respectively), caused the couple to sign new account, or "signature", cards for each account, and issued new account, or "pass", books, which Nellie placed in a safety deposit box at the aforenamed McAlester Bank, that she and plaintiff had been renting since 1965.

In July, 1964, a new joint savings and loan account was established at Phoenix Federal under the names of the plaintiff and her mother Nellie, but it does not appear that any of the latter's funds went into said account, other than what might conceivably have been derived, or remained, from the approximate sum of $10,000.00 comprised of the two previous hereinbefore described gifts from Nellie to plaintiff.

When Nellie married defendant in 1956, she had diabetes and thereafter took insulin daily the rest of her life. After the couple moved, as aforesaid, from California back to Oklahoma, where defendant had, years before, been a foreman for Manhattan Construction Company, they later (after the remodeling of the aforementioned Haileyville house) spent several thousand dollars constructing a residence for Nellie's best friend, Mrs. Blanche Walker, and her husband, O. L. Walker, an unemployed former coal miner, on the few acres of the Barnes land left remaining after the aforementioned conveyances to Henry Barnes and the condemnation for the Eufaula Lake site. A little later, more funds were expended for construction of their own residence, a modern, all-electric, home, within the same fenced enclosure as the one they built for the Walkers.

On the Sunday or Monday, before Nellie died on Tuesday, she became seriously ill at home, and her son, Thomas, was called. He then went to her home and took her to a McAlester Hospital, accompanied by Mrs. Walker.

After Nellie's burial, plaintiff and her aforenamed brothers met with defendant, at the aforementioned Bank, where said Bank's Mr. Priddy opened the aforementioned safety deposit box and read Nellie's will therein found. Mr. Priddy then advised them to take the will to the County Judge's office, and further told them that none of the box's other contents should leave the box, pending the making of an inventory of its contents. Upon going to the County Judge's office, they decided that they should engage an attorney. They then went to the office of Mr. Brown, who, as aforesaid, had drafted the will.

Thereafter, Mr. Brown's law firm instituted, as County Court Case No. 7920, probate proceedings In Re Nellie's Estate, wherein her hereinbefore quoted will was

thereafter admitted to probate. In said proceedings, plaintiff was appointed and took her oath as executrix of said estate, in June, 1965. Her inventory of said estate, as its executrix, included, among other property, (personal and real) the balances then remaining in the two aforementioned joint savings accounts, No. 4249–SM (formerly 3033) and No. 4251–SM (formerly 3522).

Thereafter, in August, 1966, plaintiff instituted the present district court action against defendant. To her lengthy petition, she attached copies of the aforementioned antenuptial agreement and her mother's will, and alleged some of the facts hereinbefore stated, together with allegations, among others, to the effect that plaintiff's and her brothers' hereinbefore mentioned relinquishment, to Nellie, of all of their interests in the Barnes land, had been induced by oral representations and an agreement that she would devise all of said property to them in her will, if they would let her keep, and use, it during her lifetime; that despite defendant's entering into the antenuptial agreement with Nellie and his agreement not to claim any of her separate property, except what she should thereafter leave him by will, after the couple married, he began "a course of domination, overreaching and constant suggestion and insisting that the real estate * * * (be put)" in both their names as joint tenants; that after the sale of Barnes land to the United States Government for the construction of Lake Eufaula, defendant undertook a course of conduct designed to alienate Nellie from her children, and, after she was in ill health, made her believe that, unless she deposited the proceeds of said sale in a joint bank account in both their names "so that he could draw on them, he would not be able to take care of her and that he, by word, act and deed implied that her money would be tied up so that she would suffer the consequences unless she did as he directed, and under his fraudulent misrepresentations and under the mistaken belief that as long as she kept the books in said accounts in her exclusive

control and in her lock box * * * (in the bank) * * * no change in ownership would take place." Plaintiff further alleged that the money in Phoenix Federal Accounts No 4249 and 4251 was Nellie's, and that the books to these accounts, as well as the note and mortgage in the amount of $3017.00 from the aforementioned Blanche Walker and her husband, and the hereinbefore mentioned note from the Wards "were kept under the complete dominion and control * * * (of Nellie)" so that defendant "had neither access to or possession in anywise * * *" at the time of her death.

Plaintiff's petition further alleged that, by fraudulent means and misrepresentations, defendant caused Nellie to use part of her funds to purchase the herein aforementioned Ford Sedan, whose title was taken in his name.

In the petition's prayer, plaintiff asked, among other things, for a judgment against defendant "setting over" to plaintiff, as executrix of Nellie's estate, the accounts, funds, and property involved, and ordering defendant to "sign over" to her the "notes and accounts taken in his name with money belonging * * *" to Nellie, or her estate, and directing Phoenix Federal and the Walkers and the Wards to make payments to her, as said estate's executrix, and require defendant "to turn over" to plaintiff executrix, all money and property "taken or appropriated to him contrary to his contract and said Will * * *". Plaintiff further prayed the court to reform all instruments, agreements, accounts, car titles and other evidences of ownership of the property in question so that said property and accounts would be held in the name of Nellie Barnes Robbins only, rather than in both hers, and the defendant's, names, as husband and wife, or joint tenants. In said petition, plaintiff also prayed for a temporary restraining order to prevent defendant from removing, transferring, alienating, mortgaging, or otherwise disposing of, any of the funds, or property, involved.

The temporary restraining order prayed for was issued August 5, 1966, immediately

upon the filing of plaintiff's petition. Thereafter, at a hearing the following month to determine whether said restraining order should be continued in force after its return date, both the plaintiff and defendant, as well as officers of the National Bank of McAlester, and Phoenix Federal testified, and among other documents, various records from these financial institutions were introduced in evidence.

Defendant made it plain during his testimony at the hearing that he was making no claim to the Walker note and mortgage, but that he did claim to have succeeded to the proceeds of the obligation represented by the Ward note and mortgage. He also made it plain that he considered the above described joint accounts as never having been any part of Nellie's estate. It was also made plain that plaintiff did not claim that her mother, Nellie, was ever incompetent. It was also revealed at this hearing that there was no written instrument purporting to be a conveyance by plaintiff and her brothers, after their father's death, of any interest in the form of a fee, or life estate, in the Barnes land that they may have inherited from him.

At the close of the hearing, the court dissolved its previous restraining order.

In the answer defendant thereafter filed, he denied, in substance, that he had ever used any fraud, or asserted any domination or coercion over Nellie or had otherwise wrongfully induced her to put money in the couple's joint accounts, but alleged that, on the contrary, it was her own voluntary wish to do this, with the knowledge and understanding that, upon the death of either of them, all of the money then remaining therein would belong to the survivor. He specifically alleged that Nellie intended, as a gift to him, any money that might have accrued in said accounts at the time of her death. His further allegations, among others, were to the effect that he always had access to Nellie's bank safety deposit box, and, in substance, denied that she ever intended, by putting the replaced account books of their joint savings and loan accounts in said box, to claim, or retain, the commingled funds in said accounts, as her own exclusive property.

Thereafter, plaintiff amended her petition by characterizing as the subject of a "trust", the property which Nellie and defendant held, as joint tenants, at the time of her death; and alleged, in substance, that, as a matter of equity, it should be considered a constructive trust in favor of the Nellie Robbins' estate. Plaintiff attempted to inject the estoppel theory into the case by alleging, in substance, that the couple's antenuptial agreement, defendant's concurrence in the provisions of Nellie's wills, and certain statements he made after her death, as to the reason his name was placed (with Nellie's) on the accounts and records involved, now estopped him from claiming that this was done to effect a gift to him from Nellie.

Plaintiff's reply contained allegations constituting specific denials of those contained in defendant's answer; and, among other things, pleaded lack of consideration for transferring any of Nellie's assets, claimed by defendant, to be gifts to him. Plaintiff further alleged that due to the close trust relationship of the parties to the Robbins' marriage and defendant's position, as Nellie's husband, "he should be held to a strict explanation and accounting *to* the reasonableness, adequacy and validity of any consideration of said transaction, as a matter of law, he being presumed to have dominion over the elderly and inexperienced Nellie Robbins, formerly Barnes, and in a position to take advantage of her, overreach her, and unduly influence her."

At the subsequent trial of the cause in April, 1967, there was no evidence that, after the death of her first husband, Barnes, Nellie made any binding promise to plaintiff and her brothers that, if they would relinquish to her their inherited interests in his estate, she would see that they succeeded to all of it upon her death. While plaintiff and one, or two, of her witnesses gave testimony indicating that there was an understanding between Nellie and her children, the plaintiff and those of her brothers

who were interrogated about it on cross examination, in effect, admitted that, after they turned over their interests in their father's estate to her (the record here does not show how this was done) Nellie was free to make any disposition she saw fit for her own best interests.

This was pointed out in the written findings of fact and conclusions of law that the trial court filed a few months after the close of the trial. In this lengthy document, the court also found (among other findings and conclusions) in effect, that the hereinbefore quoted antenuptial agreement, and the fact that Nellie's will contained no bequest or devise to defendant, except a life estate in the couple's home, constituted no legal impediment to defendant's entitlement, as Nellie's surviving joint tenant, to the balances remaining in the savings and loan association accounts, numbered 4251 and 4253, supra; that Nellie intended her interest in these accounts as a gift inter vivos to defendant; and that defendant was made a joint tenant in them through no fraud, coercion or overreaching on his part. The court further found, in substance, that, although Nellie may have originally had an understanding with plaintiff and her brothers that she would will to them all of their father's estate, not disposed of for her own needs and comfort during her lifetime, that this did not preclude her from changing her mind, and then, after the bulk of said estate's land had been sold for the construction of Lake Eufaula, arranging that defendant could succeed to a part of said sale's proceeds. As to the joint tenancy bank account, the court found that the balance in it of $1040.94, at the time of Nellie's death (after the clearing of two outstanding checks) was intended to defray "outstanding debts, last illness and burial." Accordingly, in its judgment thereafter entered, the court decreed this sum to the plaintiff, and adjudged the hereinbefore mentioned Ford automobile, the two joint tenancy savings and loan association accounts, and a life estate in the home, to be the property of the defendant. By a later order entered in October, 1967, the court authorized plaintiff (with the approval of the probate court) to collect the hereinbefore mentioned Ward note on behalf of Nellie's estate.

After the court had overruled the motion for new trial, previously filed by the plaintiff, she perfected the present appeal.

 The pertinent substance of the arguments advanced by plaintiff, under six propositions, for reversal of the trial court's judgment, may be briefly summarized as follows: That by reason of the oral understanding, after Thomas S. Barnes' death, between Nellie and her children, that, if the latter would turn over to her their inherited interests in their said deceased father's realty, as testified to by some of plaintiff's witnesses and evidenced by a 1961 oil and gas division order (which appears to have been introduced in evidence as "Exhibit A", but is not in the record) and which agreement Nellie kept herself free to carry out by entering into the antenuptial agreement with defendant, and devising him only a life estate in that part of said realty that remained when the will was executed (on which she and defendant had constructed their residence) the money in the two joint tenancy savings and loan association accounts was the "res", or subject, of a trust, whose beneficiaries, or cesti ques, were those children, the plaintiff and her brothers; and that this money could not have been a gift inter vivos from Nellie to defendant.

In her argument under proposition "II" of her brief, plaintiff contends that the evidence in this case is "clearly comparable" to that in Flesher v. Flesher, Okl., 258 P.2d 899, with the plain implication that application here, of the same principles applied there, will produce a like result.

We agree with defendant that the evidence here is not like the evidence in the Flesher case, but, materially different. In that case there was not only no question but that Abbie Flesher had made no con-

tribution to the joint accounts established by Mrs. Cook, but there was convincing evidence that it was Mrs. Cook's desire that the money in said accounts be distributed to other beneficiaries, besides Abbie. The record contains no such evidence with regard to the joint savings and loan association accounts involved here.

In support of her argument that it was understood and agreed between Nellie and the defendant, that he was to have no more of her estate than a life estate in the home the couple built on the Barnes land, as aforesaid, plaintiff, under her proposition "III", quotes a portion of the testimony of her witness, Mrs. Wynona Schaefer, who was employed as a legal secretary in her attorney's law firm at the time Nellie's and the defendant's separate wills were drafted and executed there. From the wording of part of this testimony, it could probably be inferred—and it may well be—that, at that time, August 23, 1962, which was before the hereinbefore mentioned joint savings and loan association accounts were established for Nellie's sons, Thomas and Henry (which latter had been excluded in her will) there had not yet been formulated any complete plan of dividing money assets between her heirs, through the medium of such accounts, but, as the trial court's findings indicate was his opinion, there was nothing to keep Nellie from thereafter changing her mind, and carrying out such a plan. We have carefully examined the record, including more than 550 pages covering the testimony of all of the witnesses, in two separately bound volumes, and can only conclude that the trial court's material findings of fact, and pertinent conclusions of law, are neither clearly against the weight of the evidence, nor contrary to law. From the evidence as a whole, we think it is only reasonable to conclude that, as early as September 5, 1962, when the newest of the two savings and loan association accounts in Nellie's and the defendant's names was established, namely, account No. 3522, later No. 4251 (not to be confused with the older account No. 3033, later 4249, which appears likely to have funds from the sale of defendant's California home in it) Nellie decided to complete the plan she had commenced. Furthermore, although plaintiff cites a much larger total of sums that passed through Nellie's and the defendant's joint bank account, than the more than $45,000.00 received from the condemnation of the Barnes land, we find no accurate or unequivocal proof (considering the substantial sums of money that the couple must surely have expended on the Ward and Walker homes, and upon the home of the Robbins themselves to give it the $20,000.00 value defendant testified he had been told similar contractor-built houses cost) that, in following this pattern of gifts inter vivos to her prospective heirs, Nellie did not fully comply, as explicitly as possible—in a situation in which realty had been converted to money—with any previous agreement she may have had with her children to see that they received their share of their father's estate, on (or before) her death.

Although we have not mentioned all of plaintiff's arguments, we have considered them (in view of all of the court's findings and after a thorough examination of the record) and have determined that none possess substantial merit. We recognize from the evidence as to the principles covering such joint savings and loan association accounts as the two involved here, that, during Nellie's lifetime, either she or defendant, both of whose names appear on the account signature, or account, cards, could have individually withdrawn all of the funds therein; but the fact remains that this was not done, in which situation the survivor succeeds to the whole. And under the evidence of this case, we do not consider significant, or as an attempt to retain exclusive dominion over such accounts in such a way as to obstruct the vesting of title thereto upon death, the fact that Nellie placed in the aforementioned bank safety deposit box the new account books that were issued after the original ones were thought lost.

Nor is our opinion that the findings and judgment of the trial court are neither clearly against the weight of the evidence, nor contrary to law, altered by the burden of proof plaintiff's arguments would place upon the defendant, because of his matrimonial—and therefore presumptively confidential—relationship with Nellie. This Court demonstrated in Holliday v. Holliday, Okl., 327 P.2d 456, that the presumption of undue influence over the "weaker" person, by the dominant person, in such a relationship generally, does not apply with equal force to a person like the defendant who has a natural claim to the other's bounty, and under facts, such as the trial court found, that are amply supported by the evidence. See also McKinney v. Odom, Okl., 363 P.2d 272.

In accord with the foregoing, the judgment of the trial court is hereby affirmed.

All the Justices concur.